Herbert F. STEIGLER, Defendant Below,
Appellant,

v.

The STATE of Delaware, Plaintiff Below,
Appellee.

No. 41.

Supreme Court of Delaware.

Feb. 16, 1971.
Rehearing Denied May 11, 1971.

See also Del.Super., 252 A.2d 300.

William E. Taylor, Jr., of Taylor, Lindh, Paul & Abramo, Wilmington, for defendant below, appellant.

John G. Mulford and Richard W. Weir, Jr., Deputy Attys. Gen., for the State, appellee.

WOLCOTT, C. J., and CAREY and HERRMANN, JJ., sitting.

CAREY, Justice:

The appellant, Herbert F. Steigler, was convicted in Superior Court upon three charges of murder in the first degree and one charge of assault with intent to com-

mit murder. He has appealed from the sentences imposed thereupon. His contentions are numerous and will be discussed individually.

The crimes with which the appellant was charged took place very early in the morning of October 19, 1968. The persons killed were appellant's father-in-law, mother-in-law, and his six-year-old daughter. Their deaths resulted from a fire which gutted appellant's home near Wilmington. At the time of the fire, the appellant, his wife, and their young son were also in the house. The State contended, and the jury found, that the blaze was deliberately started by the appellant. Appellant agrees that the fire was deliberately started by someone, but denies any knowledge of, or connection with, the act.

The home of appellant and his family faces north on Murphy Road in Deerhurst. It is a two-story building with a cellar. On the first floor, there is a living room at the northwest section and a den at the northeast section. The living room and den are separated by a stairway leading to the second floor. At the bottom of the stairway is a landing, from which there are two or three steps to the den floor on the east and the living room floor on the west. The north side of the landing is blocked off by a closet. Directly behind the westerly portion of the living room is the dining room; directly behind the den is a downstairs bedroom; between this bedroom and the dining room is the kitchen. There is an outside door leading into the living room in the front of the house; another outside door at the east end of the house leading into the den; and a third door in the rear leading into the bedroom.

At the top of the stairs, there is a hallway to the right leading to two bedrooms on the westerly side of the house. Directly in front of the stairs is a bathroom. Immediately to the left of the stairs is the master bedroom and bath.

At 2:28 a. m., the Talleyville Fire Company was notified by telephone that the Steigler house was on fire. The first fire engine reached the house at 2:32 a. m. One of the firemen on the engine was Mr. Lynch, who is also a Deputy State Fire Marshal. The firemen learned from someone standing outside that there were still people in the building. Some of the firemen tried to enter the building but were forced back by the terrific heat and smoke. Two or three, including Mr. Lynch, wearing gas masks and other protective clothing, entered the house. Mr. Lynch managed to crawl along the floor through the kitchen and dining room into the living room. He testified that the heat was intense and that when he reached the landing at the bottom of the stairs, the heat was tremendous and became more severe as he went up the steps. The firemen managed to remove the body of appellant's mother-in-law from the northwest bedroom. The bodies of appellant's father-in-law and daughter were removed from the southwest bedroom. All were dead.

Mr. Lynch, on his trips through the house, had noticed several things which caused him to realize that the fire had been deliberately set. He reported the matter to the State Police, and Sgt. Bramble arrived at the scene about an hour after the fire had started. Lynch and Bramble went through the house and found nine containers placed at various locations in the living room, den, and stairway. Some of the containers still contained gasoline. some were one-gallon containers and at least one was a two-gallon container. One of these had been placed on the floor of the upstairs hallway directly at the top of the stairs. It was broken into pieces and gasoline from it had saturated the carpet. Another was placed immediately adjacent to the front door, and another was directly in front of the east door leading into the den. A considerable quantity of gasoline had soaked into various rugs and the carpet in the two front rooms. On the stair landing, they found what was later identified as the melted base of a plastic container about ten inches in diameter. This

proved to be the residue of a five-gallon container exactly like another which was found on the premises. All these containers were later identified by appellant and his wife as having come from their basement and garage.

Later in the day, Sgt. Bramble discovered in the garage a Mason jar containing gasoline and topped with a cloth. A piece of that same cloth was found stuffed into the mouth of another container found in the yard. This was a wine bottle filled with gasoline, described as "Molotov cocktail."

About 6:30 that morning, Sgt. Bramble learned that the appellant and his wife had gone to the nearby home of a friend. He went there and talked with appellant for a short time, during which appellant gave the Sergeant his version of what had happened. Later, at the request of Sgt. Bramble, the surviving members of the family went to the police station for fingerprinting, in order that their fingerprints could be identified from others that might be found at the house or on the containers. In the meantime, the police had taken those containers to the police station. Thereafter, appellant and his wife went back to the house with Sgt. Bramble and showed him where the containers had come from in the basement and garage.

Sgt. Bramble obtained from appellant the names of two individuals who he thought might be suspects. Three days later, appellant gave the Sergeant an additional name, and on the following day, he gave the Sergeant a list of twenty-six persons who owed him money. Most of these persons were checked out by the State Police; one was dead, several could not be found, and the others were eliminated as suspects after investigation.

Within a period of about fifteen hours after the fire, the officers took pictures of the interior of the house and took therefrom various pieces of carpet and rugs, the pieces of cloth referred to above, and a plastic screen, all of which were admitted into evidence at the trial. The appellant objected to the admission of the pictures, certain jugs and the remnants of the broken glass container.

From the testimony of the appellant, his wife, and his son, it is clear that all occupants of the house had retired by 12:30 a.m. The appellant gave the police the following account: He prepared for bed, but went back downstairs to watch T.V.; about 1:15 a.m., he went to bed and sometime after 2:00 a.m., was awakened by a noise downstairs. Thinking that he must have failed to turn off the television, he started downstairs in his bare feet. He did not see the container at the head of the stairs because the light bulb had burned out. When he arrived at the landing, there was a sudden noise and a flash, whereupon he ran through the den into the downstairs bedroom, picked up his son, and ran out the back door. He then tried to re-enter the den through the side door, but could not because of the terrific heat and smoke. He heard his wife caling for help, got a ladder from the driveway, placed it against the upper window sill and helped her down. It was about this time that the firemen arrived, having been called by Mrs. Steigler. She had been awakened by the noise and smoke, and ran to her door, but was forced back by the fire, which singed her face and hair. She closed the door and called the firemen. Mr. Steigler was unscathed, although his feet were bare.

This version of the episode was repeated by the appellant on the stand.

At the trial, Mr. Lynch was permitted to testify as an expert in the State's case in chief, over appellant's objection. Among other things, he testified that, if appellant had run through the den as claimed, he could not have escaped without being burned or singed, because this flash fire had occurred and spread almost instantaneously throughout the vapor area in the living room and into the den. Another expert agreed; he computed the time interval

to be 1.6 seconds between the flash and the time it would have progressed throughout the den. His estimate of time included an assumption that the fire had actually started at the far end of the living room, although in his opinion, the point of ignition was in fact at the southern portion of the den, an area in which the police had found burnt matchsticks.

The police found no evidence that there had been any outside tampering with any door or window. One window in the dining room at the rear of the house was open a few inches, but there were no fingerprints or other indications to suggest that any outsider had entered the house through that window.

## I.

■ One contention made by appellant is that the Delaware procedure of failing to keep minutes of the Grand Jury proceedings deprives him of due process of law. This argument was considered in our prior opinion in this case. Steigler v. Superior Court, In and For New Castle County, Del.Supr., 252 A.2d 300 (1969). We then ruled against this contention, and we are still of the opinion that it has no merit.

## II.

■ Appellant contends that error was committed in permitting the police to testify concerning statements made by the appellant to the police during the few days following the fire. He argues that this testimony was inadmissible because the so-called *Miranda* warnings were not given. We disagree. It is clear from the testimony that, during this period, the investigation had not reached the accusatory stage to the extent that any inherent coercion existed. Certainly, the interview with appellant at a neighbor's home soon after the fire was not in violation of his *Miranda* rights, as we pointed out in our prior opinion, cited above. We are now convinced that the interviews which took place during the following days are in the same category. The appellant was not under arrest, in custody, or deprived of his freedom of action in any significant way. Certainly, as the police admitted, appellant was a possible suspect, but he was only one of many who were being checked out. The police had every reason to think that appellant was cooperating with them in an effort to discover the perpetrator of the crime. It was not until after they had received certain reports from the F.B.I. and had eliminated other possible suspects that their suspicions centered upon him. Thereafter, no further questioning took place.

Appellant points to a letter from the State Police to the F.B.I., stating that they were sending certain items to the Bureau for laboratory studies. In that letter, reference was made to the appellant as a "suspect." Appellant suggests that this fact clearly shows that the police were lying when they testified that he was not the focus of their suspicions at the time. In our opinion, appellant attaches far too much weight to this circumstance. The letter was not written by the man conducting this investigation, but was written by a superior officer, who stated that he knew very little about this case when he wrote the letter. He testified that the letter was a form which had been supplied by the F.B.I. Moreover, the officers testified that it was the practice of the State Police to use the word "subject" in referring to a person upon whom suspicion had centered, and to use the word "suspect" as referring to anyone who might possibly be guilty of a given offense. In other words, there was ample evidence to justify the finding that the use of this word was of no real significance.

## III.

■ Appellant argues that the Court erred in admitting into evidence certain physical objects which the police had removed from the house as well as several

pictures they had taken of the interior of the house during a period of about fifteen hours after the fire. All of this was done without the obtaining of a search warrant. Practically all of these items had been seen by the Deputy Fire Marshal before the police arrived. In view of appellant's apparent earnestness in assisting the police in every way, their failure to obtain a search warrant is understandable.

At that time, the house was not fit for human habitation and, as appellant knew, the police were in possession of it and were making a very careful search for anything that might shed light on the identity of the culprit. Obviously, the appellant appeared fully cooperative with the officers. At that time, these officers had no facts upon which to base a definite belief or suspicion of the appellant. We think that appellant's actions amounted to an implied consent to the search and seizure. One can hardly expect the police to get a search warrant for a house or building when the owner is obviously cooperative and gives every appearance of being the victim, rather than the perpetrator, of a crime. Certainly the search and seizure was reasonable under United States v. Rabinowitz, 339 U.S. 56, 70 S.Ct. 430, 94 L. Ed. 653. We need not decide whether Chimel v. California, 395 U.S. 752, 89 S. Ct. 2034, 23 L.Ed.2d 685, might cause a different result because this seizure took place before *Chimel* was decided, and we consider that *Chimel* is not to be retroactively applied. The Supreme Court of the United States has never held that it is retroactive. See Shipley v. California, 395 U.S. 818, 89 S.Ct. 2053, 23 L.Ed.2d 732.

### IV.

■ Appellant contends that the pretrial publicity which this case received from the newspapers and radio rendered it impossible for him to receive a fair and impartial trial. There is no evidence to show that that publicity was anything other than factual. Every prospective juror was asked whether he had seen or heard it. A few replied that they had and stated that because of it, they felt certain of appellant's guilt. These people were, of course, excused for cause. Some of the jurors who were seated had not seen or heard the publicity and knew nothing of the case. Others who were seated stated that they had known about the publicity, but had since forgotten what was said or had not received any impression therefrom of appellant's guilt or innocence. Their answers apparently convinced appellant's counsel, as well as the trial Judge, that they were fully capable of deciding the case impartially. We find no merit in this contention.

### V.

■ Appellant next contends that the Delaware statute pertaining to selection of jurors in capital cases (T. 11 Del.C. § 3301) is invalid under Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed. 2d 776, in that it calls for a juror to be disqualified if he has conscientious scruples against a finding of guilt if the punishment is death. In the first place, our statute goes on to say that such a person is not disqualified if he feels able to render an impartial verdict, notwithstanding his opinion. In the second place, this appellant's right to have a jury drawn under the *Witherspoon* standards was fully protected by the trial Judge. The only members of the panel to be excused on this ground were those who said that they could not, under any circumstances, render a verdict of guilty when the punishment would be death.

■ Appellant's further complaint that his right of *voir dire* was unduly restricted is likewise without merit. He was permitted to ask what we consider to be a very wide range of questions. If there was error, it was in giving him too much latitude. Cf. Parson v. State, Del.Supr., 275 A.2d 777 (1971).

## VI.

Before the trial began, appellant's counsel asked the trial Judge to disqualify himself and to continue the case in order that another Judge might preside. Apparently the only reason for this request was that the Judge had presided at a hearing on certain pre-trial motions, which resulted in rulings adverse to appellant. The Judge refused to grant the request. Certainly, the mere fact that a Judge has made some pre-trial rulings against a given defendant is not in itself sufficient to require his disqualification. No adequate reason has been shown why this request should have been granted.

## VII.

Appellant complains of the denial of his motion for judgment of acquittal, made at the end of the State's case and repeated at the conclusion of all of the testimony. This application was primarily based upon the allegation that there was insufficient evidence to warrant a finding that the appellant was the person who started the fire. We disagree. In our opinion, the evidence was sufficient to justify the trial Judge's conclusion that, viewing the evidence in the light most favorable to the State's contentions, reasonable persons could conclude that the appellant was guilty of the offenses charged. We accordingly hold that the trial Judge did not err in denying the motion for acquittal and submitting the case to the jury.

## VIII.

During the cross-examination of Deputy Fire Marshal Lynch, appellant's counsel sought to question him about a criticism by some inexpert person of Lynch's work in connection with some other fire. The trial Judge sustained an objection to this line of questioning. We agree that it was objectionable in that it was remote and irrelevant, being an attempt to impeach the witness's qualification as an expert by showing that he had made a mistake in some other occurrence, in the opinion of this "lay" person. It is true that Mr. Lynch's experience was not as extensive as that of other witnesses who testified; however, his training and experience were sufficient to qualify him as a witness; the validity of his findings and opinions was for the jury.

## IX.

Appellant charges error in allowing the State to question his character witnesses concerning their knowledge of rumors to the effect that appellant had committed adultery and embezzlement. These witnesses had testified that they had known him for a substantial period and were aware of his reputation, and all except one denied having heard anything of this sort about him. The one witness stated that he had heard some rumors, but he did not believe them. We think the ruling was correct. By putting his own good name into evidence, appellant opened the door to questions on cross-examination to test the knowledge of the witnesses as to contradictory community opinion. The trial Judge has a wide discretion in ruling upon matters of this sort. We cannot say that that discretion was abused. Michelson v. United States, 335 U.S. 469, 69 S.Ct. 213, 93 L.Ed. 168.

## X.

Complainant contends that the Court erred in its instructions to the jury concerning the character testimony. The contention is that he was entitled to have the jury told that character evidence itself can raise reasonable doubt as to a defendant's guilt. Manifestly, this contention is without merit. We quote the Judge's language:

> "* * * You should give to that testimony regarding good reputation all the faith and credit that you find it entitled to.

"Character evidence of itself may be sufficient to raise a reasonable doubt whether or not the defendant is guilty, which doubt otherwise would not exist * * *."

## XI.

■ Two arguments made by appellant may be considered together. He suggests that the Delaware procedure allowing a jury to recommend mercy, and permitting the Judge to reject such a recommendation, violates the due process clause of the Federal Constitution. We need say nothing more than to point out that this jury did not recommend mercy and, of course, there was no rejection by the Judge of any such recommendation. In our opinion, this appellant has no standing to raise these questions.

## XII.

■ Another argument is that the Delaware practice is unconstitutional by permitting the same jury to determine guilt in a capital case as well as to determine whether the punishment shall be death or life imprisonment. This procedure has been followed in this State for many years. It is a practice which recognizes that not all murderers are alike, and that in some instances the interest of justice will be served by life imprisonment rather than death. We see no reason to hold that the same jury which determines guilt and the degree thereof should not also be permitted to pass upon the penalty without a separate hearing. We are not convinced that the procedure is violative of any right which a murderer has; indeed, we know of no law which requires the State to provide an alternative to the death penalty.

## XIII.

■ Appellant's next contention is that the death penalty is cruel and unusual punishment and is therefore unconstitutional. We are not aware of any appellate Court decision which has so held, although we understand that this question is presently pending before the United States Supreme Court. Some years ago, that Court held capital punishment to be constitutional. Williams v. Oklahoma, 358 U.S. 576, 79 S. Ct. 421, 3 L.Ed.2d 516. In our opinion, the matter of the retention or abolition of the death penalty is a question for the lawmaking authorities rather than the Courts.*

As was said in State v. Cannon, Del. Supr., 190 A.2d 514 (1963):

"It is the province of the General Assembly in its wisdom to give expression to the public will. * * * We think the standards of present day society are to be determined by the expressions of that society, itself, and not by an expression of the individual opinions of members of the Judiciary. * * * The only manner in which such an expression can be made is through the action of duly elected representatives of the Society whose standard is to be applied."

## XIV.

■ Appellant's final contention is that there was undue bias and prejudice shown throughout the preliminary proceedings and the trial itself, wherefore he is entitled to a new trial. The short answer to this contention is that the record itself does not justify such a contention. Appellant had nearly a year's time in which to prepare for trial. It is difficult for us to imagine anything more that could have been done in his defense. Despite certain shockingly derogatory comments in his brief and oral argument concerning the trial Judge, the record shows clearly that the Judge gave the appellant and his counsel fair and proper treatment at all stages of the case.

The judgment will be affirmed.

---

* Our Legislature did in fact abolish it a few years ago, but not long thereafter, reinstated it for the crime of first-degree murder.