**Robert STYLER, Defendant, Appellant,**

v.

**STATE of Delaware, Plaintiff, Appellee.**

Supreme Court of Delaware.

Submitted March 10, 1980.

Decided May 1, 1980.

Edward C. Pankowski, Jr., Wilmington (argued), and James R. Lally, Wilmington, for defendant, appellant.

Keith A. Trostle, Wilmington (argued), and Francis E. Mieczkowski, Jr., Deputy Attys. Gen., Wilmington, for plaintiff, appellee.

Before DUFFY, McNEILLY and HORSEY, JJ.

DUFFY, Justice:

Robert Styler (defendant) appeals from convictions in the Superior Court of rape in the first degree, burglary in the second degree and terroristic threatening.[1]

Defendant concedes that he and the victim were in the latter's bedroom on a June morning while her mother was in or about the house. His testimony conflicts with the victim's in two significant respects: He says that he was in the room at her invitation and that he did not have any sexual contact with her; the victim testified that defendant entered the house and her bedroom without permission and that he raped her. The other relevant facts appear in our rulings on the law.

After examining the record and considering the contentions of counsel, we have reached the conclusions which follow on the several issues argued by defendant.

## I

First, defendant argues that he was denied a fair trial because of certain prejudicial remarks made by the prosecutor.

We have reviewed the record and concluded that the prosecutor's remarks, viewed as a whole and in context, did not "prejudicially affect substantial rights" of defendant and therefore do not amount to reversible error. *Sexton v. State*, Del. Supr., 397 A.2d 540, 544 (1979).

## II

Defendant's second contention is that there was insufficient evidence of penetration to support the conviction of rape.

---

1. Delaware statutes define those crimes as follows:

Rape in the first degree, 11 *Del.C.* § 764:
"A male is guilty of rape in the first degree when he intentionally engages in sexual intercourse with a female without her consent, and:
(1) In the course of the offense he inflicts serious physical, mental or emotional injury upon the victim, or
(2) The victim was not the defendant's voluntary social companion on the occasion of the crime and had not previously permitted him sexual contact."

Burglary in the second degree, 11 *Del.C.* § 825:
"A person is guilty of burglary in the second degree when he knowingly enters or remains unlawfully:
(1) In a dwelling with intent to commit a crime therein; or
(2) In a building and when, in effecting entry or while in the building or in immediate flight therefrom, he or another participant in the crime:
a. Is armed with explosives or a deadly weapon; or
b. Causes physical injury to any person who is not a participant in the crime."

Terroristic threatening, 11 *Del.C.* § 621:
"A person is guilty of terroristic threatening when:
(1) He threatens to commit any crime likely to result in death or in serious injury to person or property;
(2) He makes false statements:
a. Intending to cause evacuation of a building, place of assembly or facility of public transportation;
b. Intending to cause serious inconvenience; or
c. In reckless disregard of the risk of causing terror or serious inconvenience."

The State, of course, has the burden of proving beyond a reasonable doubt that penetration occurred. 11 *Del.C.* § 301, § 773; and see *State v. Doe*, Del.Super., 351 A.2d 84 (1976). We conclude that the victim's testimony as to penetration was sufficient to support the jury's finding that a rape had occurred. We decline to disturb that finding, in accordance with the principle that "where there is conflicting testimony . . . [the higher] court will not substitute its judgment for that of the trial court, because the weight of evidence and the credibility of witnesses are within the purview of the fact finder." *People v. Parker*, 72 Ill.App.3d 679, 28 Ill.Dec. 890, 891, 391 N.E.2d 89, 90 (1979); *Hutchins v. State*, Del.Supr., 2 Storey 98, 153 A.2d 204, 207 (1959).

### III

Next, defendant contends that his constitutional privilege against self-incrimination was violated by the arresting officers' testimony concerning his silence while in custody.

The State may not comment on a defendant's exercise of the constitutional right against self-incrimination, *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *Griffin v. California*, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965); but every reference to the exercise of the Fifth Amendment privilege does not warrant reversal of a conviction. *Shantz v. State*, Del.Supr., 344 A.2d 245, 247 (1975). Here, we are satisfied that any error resulting from the officers' testimony was harmless beyond a reasonable doubt. In so ruling, we note that, as in *Shantz*, the questions were not part of a pattern or deceptive so as to "put a penalty on the exercise" of a constitutional right." *Shantz* at 246.

### IV

Defendant's fourth point is that the Trial Judge committed reversible error by refusing to limit the cross-examination of certain prospective character witnesses. Our ruling on this contention is shaped by the following legal principles: (1) the Trial Judge has wide discretion in fixing the scope of cross-examination, *Steigler v. State*, Del.Supr., 277 A.2d 662, 668 (1971); and (2) the purpose of cross-examination of a character witness is to test his knowledge about "contradictory community opinion." *DeJarnette v. State*, Del.Supr., 338 A.2d 117, 118 (1975).[2] Generally, see *Woods v. State*, Del.Supr., 315 A.2d 589 (1973).

In this case, the Trial Judge ruled that the prosecution would be permitted to cross-examine prospective character witnesses as to certain convictions of defendant, which had been entered eight to ten years before this trial, in a Pennsylvania community located about ninety to one hundred miles from Wilmington. Defendant argues that such ruling was an abuse of discretion because the convictions were too remote to be part of "community opinion."

In our view, the Superior Court's ruling was within the bounds of its discretion. When defendant moved to Delaware after his convictions for the offenses involved, his parole was transferred here and he remained on supervised parole by Delaware authorities until April 1973. We are unable to say as a matter of law that the fact of prior convictions would not ordinarily have been discussed in the Delaware community in which defendant lived, *Woods v. State*, supra, and thus we find no abuse of discretion in the Trial Judge's ruling.

### V

Defendant next argues that the Trial Court abused its discretion by permitting

---

2. As we noted in *DeJarnette*:

"The purpose of the cross-examination . . . was not to establish defendant's bad reputation, but to damage the basis of the testimony of the character witness as to the defendant's good reputation—to test the extent and accuracy of that witness' knowledge of the reputation of the defendant by showing that the witness was not actually aware of the reputation concerning which he had just testified." *Id.*

the jury to begin deliberations at approximately 4:15 p. m. on Thanksgiving Eve and to continue them until it returned a verdict at 11:03 p. m. that night. Defendant challenges the Trial Judge's administration of the deliberation phase of the case on two grounds: first, he says that the Court impermissibly forced the jury to continue deliberating into the evening, and, second, that the Judge abused his discretion by permitting deliberations to continue during the evening because of the inherently coercive effect of that scheduling.

In *Jenkins v. United States*, 380 U.S. 445, 446, 85 S.Ct. 1059, 1060, 13 L.Ed.2d 957 (1965), the United States Supreme Court held that a conviction must be reversed if the judge's conduct towards the jury "in its context and under all the circumstances" had a coercive effect. Applying that test to this case, we conclude that the Trial Judge's actions were permissible and that neither of defendant's contentions has merit.

The jury trial began on November 13, some ten days before Thanksgiving Day. Counsel completed summations on November 22, the day before Thanksgiving. The day thereafter (Friday) was also a holiday followed by the usual Saturday and Sunday recess. Thus, the alternative to permitting the jury to begin deliberations on November 22 was to recess for five days, that is, until Monday, November 27, and clearly that was undesirable.

The jury began deliberating at about 4:15 p. m. and returned to the courtroom at 5:45 p. m., when the Judge addressed them as follows:

"THE COURT: Members of the jury, I've asked that you come back and join us to discuss where we go from here in terms of time. I certainly don't want to put any undue pressure on you timewise in your deliberations. To the contrary, I'd like to convenience you, if possible.

It is now near the usual dinner hour, and we do have a holiday coming up, which can be inconveniencing to some.

What I would suggest is that we have a couple of options, at least. We could recess and come back on Monday and pick up our deliberations. I don't recommend that. Lots of things can happen in four days. The other possibility that occurs to me is that we could make arrangements to feed you at the hotel and you can continue your deliberations into the evening.

I'm wondering if that option is unacceptable—let me put it that way—to anybody in a serious way?

I don't see any affirmative response, that is that it's inconvenient.

All right, we can make any phone call or arrangements for that that you might need.

Gentlemen, I'm going to suggest that we ask the jury to return to their room. We'll make their arrangements at the hotel and very shortly we'll conduct you over there for something to eat.

Continue your deliberations. Thank you."

The verdicts were returned at 11:03 p. m.

■ It appears that the Trial Judge gave the jury a choice as to whether to continue deliberating on Wednesday evening (or not) and none of the jurors indicated that that "option . . . [was] unacceptable." Thus the Court did not force the jury to continue deliberating. And under the time frame in which the case was tried and issues put to the jury, the circumstances were not coercive as a matter of law.

## VI

■ Defendant's final argument is that he is entitled to a new trial on the basis of newly discovered evidence which establishes juror bias.[3] Juror bias, of course, will not be tolerated in our judicial system. *Sheppard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); *Jackson v. State*, Del.Supr., 374 A.2d 1 (1977). Indeed, if only one juror is improperly influenced, a

---

**3.** Superior Court Criminal Rule 33 fixes the standard for granting a new trial, thus: "The Court on motion of a defendant may grant a new trial to him if required in the interest of justice . . . .''

defendant in a criminal case is denied his Sixth Amendment right to an impartial jury. *United States v. Hendrix*, 9 Cir., 549 F.2d 1225 (1977); *Commonwealth v. Cornitcher*, 447 Pa. 539, 291 A.2d 521 (1972).

At the same time, however, there are sound reasons for limiting after-the-fact inquiries into jury verdicts. If there were no limits,

> "[j]urors would be harassed and beset by the defeated party in an effort to secure from them evidence of facts which might establish misconduct sufficient to set aside a verdict. If evidence thus secured could be thus used, the result would be to make what was intended to be a private deliberation, the constant subject of public investigation; to the destruction of all frankness and freedom of discussion and conference."

*McDonald v. Pless*, 238 U.S. 264, 267, 35 S.Ct. 783, 784, 59 L.Ed. 1300 (1915). For the reasons stated by the United States Supreme Court in *McDonald*, the courts of this State have given "the closest scrutiny" to applications for a new trial based upon the grounds of newly discovered evidence, including jury deliberations. *State v. Watson*, Del.Super., 5 Storey 285, 186 A.2d 543 (1961), *aff'd*, Del.Supr., 184 A.2d 780 (1962).

Defendant argues that the investigative procedures invoked by the Trial Judge were so deficient as to constitute reversible error, and the Court erred, as a matter of law, in determining that there was not evidence of bias.

■ Defendant's claims of bias arose and were processed in the following way: After trial, defendant learned of contacts between a spectator at the trial and certain jurors.[4] The spectator had been a member of the panel from which the jurors had been chosen, and she informed defendant of two contacts she had had with individual jurors. Defendant then informed the Trial Judge of this and a hearing was held at which the spectator testified. At the conclusion of the hearing, the Court declined to order a

new trial and denied defendant's request for an additional hearing with testimony by the individual jurors.

In substance, the two instances of alleged bias, as developed at the special hearing, are these: The first incident occurred during jury selection, when the spectator had the following exchange with the woman sitting next to her, who later served as a juror:

> SPECTATOR: "Boy, this must be a good case [because it was for attempted rape, burglary and assault]."
>
> OTHER INDIVIDUAL: "Yeah. I want to get on this one."
>
> SPECTATOR: "Why?"
>
> OTHER INDIVIDUAL: "I think people who commit crimes should be put where they belong."
>
> SPECTATOR: ". . . Shouldn't you go and tell the judge how you feel about this?"
>
> OTHER INDIVIDUAL: "No, I want to sit on it. I think they should be put where they belong."

The second incident took place on the last day of the trial, after the defense had rested. The spectator and a juror were riding together in a car and had the following conversation:

> SPECTATOR: ". . . he [the juror] asked me what I thought [about the case], and I said, 'No. What do you think? You're really not supposed to discuss the case, but you can tell me, anyway.'
>
> He said, 'Well, I think he is guilty.' I said, 'Well, wait and get the rest of the evidence until you come to a conclusion,' and he said, 'Well, I think he did it.' "

After the hearing, the Trial Judge ruled that neither incident amounted to juror bias in violation of the governing standard; the Court stated in part, as follows:

> "The motion before the Court, it seems to me, asks for either a new trial or, in the alternative, a continuing investiga-

---

4. That information was "newly discovered evidence," as that term has been applied in prior cases. See, e. g., *State v. Watson*, supra.

tion of the jury that sat on this case
. . . .

Those of us who have read the cases reported in this field are aware of the fact that the Courts generally take a dim view of entering into, directly or indirectly, the deliberations of jurors, and I think properly so.

The Courts are intent upon safeguarding the jurors, giving them as much assurance as possible that their deliberations are not only secretly conducted, but will remain protected, and so it is only in extreme cases that a Court takes the step of moving into the juryroom, so to speak.

In this instance, it seems to me that if there was evidence before the Court that one or more of the jurors had expressed an opinion in advance that the defendant was guilty, and that he or she was anxious to get on the jury to see that that particular defendant was given his just desserts, then we would have a serious problem.

I also think that if we had a juror who had been selected and was sitting on the jury, and before its conclusion, . . . was expressing a firm conclusion that the man was guilty regardless of anything, we would, perhaps, have a serious problem.

I don't find, on examining and listening very carefully to the testimony of [the spectator], that we have either of those situations. We have a woman who, at best, can be described as someone who was anxious to sit on what was considered maybe an interesting case and also expressed a concern about people who commit such crimes getting what they deserve.

. . . . .

So far, I don't see there is enough before me to warrant the Court taking the unusual step of having that juror further investigated, one way or another. And the same thing is true of [the second juror], who in an almost casual conversation with a fellow panelist, disagreed with her when she said he was not guilty so far as she was concerned, and . .

said he thought he was. There was no discussion in depth. There was certainly no statement on the part of the juror, . . . [that] he had made up his mind regardless of anything else or was not subject to persuasion as the case reached its conclusion.

Loose talk, yes. It shouldn't have been done, of course. I don't feel as though it warrants anything, either a new trial or any further investigation."

The statements to which the spectator testified were general and appear to have been made in response to a prior comment by the spectator. Certainly the statements should not have been made. But, the Trial Judge found them to be "loose talk" rather than the reflection of an improper bias against defendant. In making that judgment, the bottom line of which is that the entire case need not be retried or the jurors involved need not be summoned and investigated, we cannot say that the Trial Judge abused the very broad discretion which he has in ruling on such matters. *Compare White v. State*, Del.Supr., 404 A.2d 137 (1979); *Bailey v. State*, Del.Supr., 363 A.2d 312 (1976); cf. *Tobias v. State*, 37 Md.App. 605, 378 A.2d 698 (1977).

Other arguments made by defendant have been considered and determined to be without merit.

The judgment of the Superior Court is affirmed.