**Donald WATSON, Defendant Below, Appellant**

v.

**STATE of Delaware, Plaintiff Below, Appellee.**

No. 72, 2007.

Supreme Court of Delaware.

Submitted: July 18, 2007.
Decided: Sept. 11, 2007.

**48.** 893 A.2d 507, 525–27 (Del.2006).

**49.** *Id.* at 526–27 (internal citations omitted) (emphasis added).

F. Phillip Renzulli, Office of the Public Defender, Wilmington, DE, for appellant.

John Williams, Department of Justice, Dover, DE, for appellee.

Before STEELE, Chief Justice, HOLLAND and RIDGELY, Justices.

STEELE, Chief Justice:

The appellant defendant-below, Donald Watson,[1] appeals from his convictions in the Family Court. The Family Court judge found Watson delinquent on two counts of Rape in the Second Degree, pursuant to 11 *Del. C.* § 772(a)(1). On appeal, Watson claims that the Family Court judge (1) abused her discretion when she failed to recuse herself because his rape trial immediately followed an earlier trial in which she had found Watson guilty of Robbery in the Second Degree, and (2) erred when she found Watson delinquent on two counts of Rape in the Second Degree because that finding was against the manifest weight of the evidence. Because we agree that the Family Court judge erred when she did not recuse herself, we REVERSE and REMAND for a new hearing with a different judge. In so doing, we need not review Watson's insufficiency of evidence claim.

### FACTS

AF, the 14 year old complaining witness in the rape trial, knew Watson as a neighbor who lived down the street from her home on Elsmere Boulevard. In September 2006, Watson also was 14 years old. According to AF, the two had been boyfriend and girlfriend for three years, but AF denied that she had engaged in any consensual sexual activity with Watson.

Watson claimed that they had a consensual sexual relationship.

AF's claim of rape was based upon two alleged non-consensual sexual contacts. On September 28, 2006, AF provided a videotaped statement to a New Castle County Police Detective. In that statement, AF claimed that, on or about September 11, 2006, she had non-consensual sexual contact with Watson inside the vestibule hallway of her grandfather's home on Elsmere Boulevard. Specifically, AF told the police that on September 11, 2006, Watson forced her to have sexual intercourse with him and penetrated her vaginally from behind. AF did not immediately report the September 11, 2006 sexual assault to her family or to the police.

The police questioned Watson later that day. Watson admitted that he had sexual contact with AF at her grandfather's residence, but stated that it occurred on September 27, 2006, not September 11, 2006. Watson stated that sexual intercourse did not occur on September 27, 2006, because neighborhood children interrupted them. Watson also told the police that, before September 27, 2006, he and AF had sexual contact at her grandfather's residence and that the last time was during May 2006.

The police officer then re-interviewed AF on October 3, 2006. For the first time, AF described the September 27, 2006 non-consensual sexual contact she had with Watson at her grandfather's house. According to AF, Watson forced her into her grandfather's hallway and then forced her to perform oral sex before they were interrupted by neighborhood children. AF again described their sexual contact on September 11, 2006, and again claimed that Watson penetrated her from behind during intercourse.

---

1. Pursuant to Del.Supr. Ct. R. 7(d), we have adopted a pseudonym for the juvenile appel-   lant.

On October 6, 2006, the police officer interviewed AF a third time. This time AF did not state whether Watson forced her to engage in sexual intercourse face to face or whether he had penetrated her from behind. During this interview, AF stated that Watson requested oral sex after intercourse, but did not force her to engage in oral sex.

At trial, AF testified inconsistently with the three statements she had given to the police. She testified that, on September 11, 2006, Watson asked her to accompany him to the hallway of her grandfather's home and requested oral sex. She further testified that, after she refused, Watson pushed her against the hallway wall and then onto the stairs. For the first time, AF stated that Watson removed her pants and forced her to engage in sexual intercourse face to face, as opposed to penetrating her from behind as she had claimed in her September 28, 2006, and October 3, 2006 statements. AF also testified that she pushed Watson off her and got dressed, and that he bit her on her shoulder as she was attempting to leave.

AF testified that Watson asked her to return to her grandfather's home on September 27, 2006, but that she refused. AF stated that she then accompanied Watson to play in a nearby creek, but that Watson continued asking AF to return to her grandfather's hallway. AF testified she did not want to have sex with Watson, but admitted that she accompanied him to the hallway, claiming that she intended to flee before they arrived. According to AF, when they arrived at the hallway, Watson grabbed her arms and neck, and forced her to perform oral sex. AF testified that she did not want to perform oral sex and struggled with Watson. She further testified that, after a short time, they were interrupted by neighborhood children.

At trial, DB, AF's 12 year old neighbor, testified that she found AF crying on the hallways steps after the alleged September 27, 2006 sexual assault. DB also testified that AF had told Watson to leave her alone that day and that AF did not want to go to the hallway with Watson.

During cross-examination, when confronted with her earlier inconsistent statements to police, AF stated that her first two statements to the police "didn't count" for a variety of reasons, but that her third statement was consistent with her trial testimony.[2]

Immediately before his rape trial, the Family Court judge who was assigned to the rape case tried Watson on charges of Assault in the Third Degree and Robbery in the Second Degree. During that trial, Watson testified in his own defense. After weighing the credibility of the parties and witness, the Family Court judge found Watson delinquent on both counts. Ten minutes after she entered her findings of

---

**2.** The record reflects that AF's trial testimony is substantially inconsistent with her statements to the police. With regard to the alleged rape on September 11, 2006, AF made numerous inconsistent statements about the following facts: (1) whether Watson forced her to perform oral sex on September 11, 2006; (2) whether Watson penetrated her from behind or they were face to face during their sexual contact; and (3) whether Watson bit her on her shoulder during or after intercourse. Specifically, according to AF's statements on September 28, 2006, and October 3, 2006, Watson penetrated her from behind, while at trial she claimed that Watson penetrated her from the front and they were face to face. With regard to the alleged rape on September 27, 2006, AF's own witness DB testified that she saw AF and Watson walking into her grandfather's duplex and she observed that AF was walking on her own volition rather than being forcibly led into the duplex with her arms pinned behind her, as AF had testified during her direct examination.

delinquency, the same Family Court judge then proposed to preside over Watson's rape trial. Watson immediately moved for a continuance in order to have the matter scheduled before a new judge and argued that he would suffer unfair prejudice if the same judge tried the second matter after finding him delinquent of the two other charges mere minutes before. The Family Court judge denied Watson's motion, stating her belief that she would be capable of "starting fresh" on matters of his credibility. The trial judge also stated that it would be impractical for her to recuse herself because of the limited number of judicial officers in the Family Court.

After the trial, the Family Court judge found Watson delinquent on both counts of Rape in the Second Degree. Watson has appealed from the Family Court's final judgments, claiming that the Family Court judge (1) abused her discretion when she failed to recuse herself after just having found Watson guilty of Robbery in the Second Degree in a trial concluded only minutes before the trial on two counts of Rape in the Second Degree, and (2) erred when she found Watson delinquent on two counts of Rape in the Second Degree because that finding was against the manifest weight of the evidence.

## DISCUSSION

■ We review a trial judge's decision not to recuse herself for abuse of discretion.[3] "The requirement that judges be impartial is a fundamental principle of the administration of justice."[4] To this end, this Court has crafted rules of dis-

qualification to "ensure that no judge shall preside in a case in which he is not disinterested and impartial."[5] These rules are codified in the Delaware Code of Judicial Conduct, which provides that:

(1) A judge should disqualify himself in a proceeding in which his impartiality might reasonably be questioned, including but not limited to instances where:

(a) The judge has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding.[6]

■ When the basis of a claim is that a judge has a "personal bias or prejudice concerning a party," we have crafted a two part analysis to review a trial judge's recusal decision. Specifically, (1) as a matter of subjective belief, the judge must be satisfied that he or she could proceed to hear the case free of bias or prejudice concerning a party, and (2) even if the judge believes that he or she has no actual bias, we must determine whether "there is the appearance of bias sufficient to cause doubt as to the judge's impartiality."[7] "On appeal of the judges' recusal decision, the reviewing court must be satisfied that the trial judge engaged in the subjective test and will review the merits of the objective test."[8]

■ Here, the Family Court judge satisfied the first requirement of the two part test. At the beginning of his rape trial, Watson asked the Family Court judge to reschedule his trial with a different judge who was not aware of his earlier convictions. The Family Court judge denied his motion, declaring that she held no preju-

3. *Jackson v. State*, 684 A.2d 745, 753 (Del. 1996) (citing *Los v. Los*, 595 A.2d 381, 385 (Del.1991)).

4. *Los*, 595 A.2d at 383.

5. *Id.*

6. Del. Judges' Code of Judicial Conduct Canon 3C(1).

7. *Los*, 595 A.2d at 385.

8. *Id.*

dice against Watson as a result of his previous trial and that she believed she would be capable of starting "fresh" in assessing Watson's credibility. Because the Family Court judge subjectively believed that she could proceed to hear the Watson's case free of bias or prejudice, the subjective prong is satisfied.

■ Under the second prong of the *Los* test, we review the merits of the issue objectively and determine whether there is an appearance of bias sufficient to cause doubt about the judge's impartiality.[9] In *Weber v. State*,[10] we held that "[t]here is no general rule that a judge is disqualified *per se* because of an adverse decision in a former case involving entirely different and unrelated criminal charges against the same party."[11] Specifically, in *Weber*, we found that there was no appearance of bias when a trial judge had entered an adverse ruling against the defendant several years earlier and, by the time of the new proceedings, barely remembered the earlier case.[12]

This case is distinguishable from *Weber*. In *Weber*, we had no reasonable basis to question the trial judge's impartiality because the judge could barely remember the earlier case, which had occurred several years earlier. Here, by contrast, there was only a ten minute time lapse between Watson's robbery convictions and the beginning of his trial on two counts of Rape in the Second Degree. When Watson's rape trial began, the Family Court judge was acutely aware of Watson's earlier adverse adjudication and could not help but have a specific impression of his credibility

as a result of her findings in that case. Indeed, in the earlier hearing, Watson's credibility was a central issue and the Family Court judge opined on that credibility when she declined to believe his denial that he had robbed the victim after he admitted assaulting the victim.

Moreover, in *Weber*, there was substantial corroborating evidence supporting Weber's earlier conviction and the trial judge was not a fact finder in the earlier case. Thus, the judge's knowledge of the defendant's earlier adverse adjudication had little, if any, direct impact on his later case.[13] Here, by contrast, Watson was on trial for raping AF, who had been his girlfriend for three years. There was no overwhelming forensic or physical evidence relied on to convict Watson. The evidence against Watson consisted almost entirely of AF's adverse testimony—testimony Watson pointedly disputed. AF's trial testimony was fundamentally inconsistent with her earlier out of court statements, particularly with regard to the alleged rape on September 11, 2006, and no physical evidence or direct eyewitness testimony supported her accusations. As a result, Watson's credibility became a central issue and the Family Court judge's adverse credibility determination was critical to his rape convictions.

■ It is well settled in Delaware that "a victim's testimony concerning alleged sexual contact alone is sufficient to support a jury's guilty verdict. There is no requirement that testimonial evidence be corroborated either by physical evidence or corroborating testimony."[14] But,

---

9. *Id.*

10. 547 A.2d 948, 952 (Del.1988).

11. *Id.* (citing *State v. Cabiness*, 273 S.C. 56, 254 S.E.2d 291, 292 (1979)).

12. *Id.*

13. *Weber*, 547 A.2d at 951.

14. *Hardin v. State*, 840 A.2d 1217, 1224 (Del. 2003) (citing *Styler v. State*, 417 A.2d 948, 950 (Del.1980)).

here, since the alleged victim's testimony was substantially inconsistent with her earlier out of court statements to the police, it became critically important for the Family Court judge to assess both her and Watson's credibility and to weigh the two.

Moreover, unlike *Weber*, the Family Court judge here was the sole trier of fact. Only ten minutes after finding that Watson's testimony was not worthy of belief in an earlier trial, the Family Court judge had to assess Watson's credibility anew in a trial on unrelated charges where a credibility assessment inevitably determined the outcome. Although the Family Court judge subjectively believed she could "start it fresh as far as [Watson's] credibility is concerned," it is undeniable that, during Watson's second trial, she must have been acutely aware of her earlier assessment of Watson's credibility. Specifically, in the rape trial, the Family Court judge determined AF was credible despite the numerous inconsistencies in her statements, finding that "perhaps some of [AF's] details are still not accurate," but "she seemed credible today." On the other hand, the Family Court judge determined that Watson was not credible, simply giving as her reason that she did not believe that Watson could remember where he was on September 11, 2006.

Indeed, the Family Court judge demonstrated a troubling appearance of bias when she assessed the witnesses' credibility. Because there was no substantial independent evidence against Watson, the assessment of his credibility became critically important. Because the Family Court judge, as the sole fact finder, had determined that Watson was not credible in an unrelated case shortly before his rape trial, and, moreover, was conscious of her own adverse determination about Watson's truthfulness just minutes beforehand, we conclude that the appearance of bias

demonstrated in this case was sufficient to doubt the Family Court judge's ability to weigh the truthfulness of the two contending antagonists' testimony impartially.

■ Other than *Weber*, there are no other Delaware cases directly addressing this issue. However, *Baker v. State*, 906 A.2d 139 (Del.2006), suggests that it was inappropriate for the Family Court judge to hear Watson's second case. In *Baker*, we held that in a "he said, she said" rape and sexual abuse case, it is impermissible for a prosecutor to ask the defendant an unfounded question that permits the jury to draw an impermissible conduct-from-character interference that is entirely unjustified. *Id.* at 153. The rationale underlying our decision was that, when credibility becomes the ultimate issue in a case, it is unfairly prejudicial for the fact finder to learn of any unrelated facts that might potentially affect the defendant's credibility. This reasoning is applicable here. In this rape case, the witnesses' credibility was the central issue for the trial judge to determine.

We note that Delaware courts have been reluctant to disqualify a judge under Canon 3C(1) and the *Los* test. *See, e.g., Robinson v. State*, 869 A.2d 328, 2005 WL 535007, 2005 Del. Lexis 72 (Feb. 14, 2005) (finding there was no sufficient appearance of bias when the defendant had been accused of threatening a superior court judge who later presided over the defendant's sentencing hearing on an unrelated matter); *Johnson v. State*, 797 A.2d 1206 (2002) (holding that there is no appearance of impropriety sufficient to warrant recusal when the judge learned negative facts about the defendant from a social gathering held by a prosecutor in a former case involving the defendant); *Steigler v. State*, 277 A.2d 662, 668 (Del.1971) (holding that the bias envisioned by Canon 3C(1) is not created merely because the trial judge has

learned facts or made adverse rulings during the course of a trial). However, here the stigma surrounding the appearance of an inability to assess credibility fairly demands this result.

### CONCLUSION

Based on the foregoing, we REVERSE the judgment of the Family Court and REMAND for a new trial before another Family Court judge. Because we remand on Appellant's first claim of error, we do not need to address his second claim of error regarding the sufficiency of the evidence against him. Jurisdiction is not retained.