**Mark PURNELL, Defendant Below, Appellant,**

v.

**STATE of Delaware, Plaintiff Below, Appellee.**

No. 556, 2008.

Supreme Court of Delaware.

Submitted: July 8, 2009.

Decided: Aug. 25, 2009.

Peter W. Veith, Peter W. Veith, Esquire, P.A., Wilmington, DE, for appellant.

Elizabeth R. McFarlan, Department of Justice, Wilmington, DE, for appellee.

Before STEELE, Chief Justice, HOLLAND and RIDGELY, Justices.

STEELE, Chief Justice:

Defendant–Appellant Mark Purnell appeals from his Superior Court convictions of murder in the second degree, attempted robbery in the first degree, conspiracy in the second degree, and related firearms charges. Purnell raises two arguments on appeal. First, he contends that the trial judge abused her discretion by ruling that statements made by a deceased witness were inadmissible hearsay. Second, he contends that the trial judge abused her

discretion by denying his motion for a mistrial as a result of juror misconduct. Because the trial judge did not abuse her discretion in either instance, we **AFFIRM**.

## I. Facts and Procedural History

In the early evening hours of January 30, 2006, Ernest and Tameka Giles were walking along the sidewalk near Fifth and Willing Streets in Wilmington. The married couple was carrying several shopping bags containing their recent purchases from Walmart. As they walked, two young men approached them and demanded money. Mrs. Giles recognized one of the men, calling him by name, Mark.[1] Mrs. Giles refused to give up her belongings and kept walking. The young man then fired a single shot, hitting Mrs. Giles in the back. She fell to the ground and Mr. Giles screamed for help. The two men fled the scene.

Officers from the Wilmington Police Department responded to the scene and administered first aid to Mrs. Giles. The police placed Mr. Giles, who was hysterical, in the back of a patrol car. Paramedics transported Mrs. Giles to the Christiana Hospital where she died from her injuries.

Angela Rayne witnessed the murder/attempted robbery while sitting on a step near the intersection of Fifth and Willing Streets smoking crack cocaine. Rayne saw two young men walk past her, turn around, and then walk past her again. She then saw a man and a woman coming up the hill and the two pairs of people walk past each other. Rayne heard one gunshot and then saw the two young men running away. Rayne testified that she had seen one of the two assailants earlier in the day at Fifth and Jefferson Streets in the company of the Wilmington police. Using that information, the police developed a suspect, Ronald Harris, and included his picture in a photo array. After viewing that array during an interview with the police on February 16, 2006, Rayne identified Harris as the assailant whom she had seen earlier on the day of the attack.

Shortly after the shooting, the police briefly interviewed Mr. Giles at the hospital while his wife was being treated for her injuries. Mr. Giles was interviewed a second time at the police station on February 3, 2006. By that time, police had discovered a number of facts that led them to believe that Mr. Giles might have had some involvement in the incident. He then became a person of interest in the investigation of his wife's murder. Mr. Giles had a history of domestic violence directed against his wife. The police discovered that Mr. Giles lied to them about his reason for being in the vicinity of the shooting and about his whereabouts after Mrs. Giles died in the hospital. The police also discovered that Mrs. Giles had made statements that her husband had stolen her tax refund in 2005. Additionally, only a day or two before the murder, Mrs. Giles had received a tax refund check in the amount of $1700, which was unaccounted for. Mr. Giles lied to the police about how they spent the refund check.

During his interview with police on February 3, Mr. Giles first told police that he did not believe that he would be able to recognize the perpetrators unless they were dressed the same way that they had been at the time of the crime. Later, while alone in the interview room, Mr. Giles made several cell phone calls and

---

1. Kellee Mitchell informed Detective Gary Tabor that Mark Purnell later told Mitchell this fact.

indicated to his callers that the police viewed him as a suspect. After this, the police asked Mr. Giles to look at a photo array, which did not contain Purnell's photo. Mr. Giles selected two pictures that he stated, taken in combination, were "close" to what one of the perpetrators looked like, but only if the men in the photos were 5'4" or 5'5" in height.

On February 16, 2006, police interviewed Mr. Giles a third time. During that interview, Mr. Giles stated that he had only seen the shooter from the side and that the shooter was wearing a hat. He then selected two more photographs that he said looked similar to the shooter. One of those photos was of Kellee Mitchell. Mr. Giles then pointed to the picture of Mitchell and said "it might have been him," and that between the two photos, the shooter looked most like this one. Then, after some hesitation, he said that he could be wrong, it might have been the other one.

Based on Rayne's identification of Harris and Mr. Giles' identification of Mitchell, the police applied for and were granted search warrants for Harris' and Mitchell's apartments. Both apartments were in the same building about five blocks from the shooting. The police executed the search warrants on February 18, 2006 and arrested both Harris and Mitchell. Purnell, who was not a suspect at the time of the search warrant, was inside Harris' apartment. The police did not arrest Purnell. The police did not charge Harris or Mitchell with killing Mrs. Giles. They did charge Harris with attempted robbery in the first degree, possession of a deadly weapon during the commission of a felony, and conspiracy. They charged Mitchell with an unrelated firearms offense.

A few days after the police executed the search warrants and arrested Harris and Mitchell, the police separately showed Giles and Rayne photo arrays containing Purnell's picture. Neither Giles nor Rayne identified Purnell as one of the two assailants.

The focus of the investigation did not shift to Purnell until January 2007 when police arrested Corey Hammond for drug charges. Hammond informed the police that he had seen Harris and Purnell together on the day of the shooting and that Purnell complained of being broke. When Harris asked Purnell what he was going to do about it, Hammond observed that Purnell had a firearm in his waistband. When Hammond saw Purnell a few days later, Purnell allegedly bragged, "I told the bitch to give it up, she didn't want to give it up, so I popped her." Several other witnesses testified that Purnell made similar inculpatory remarks at various times; including telling Mitchell that the incident occurred because it was "tax time." As a result of the continuing investigation into Mrs. Giles' murder, police arrested Purnell in January 2007 and the State indicted him on charges of felony murder in the first degree, attempted robbery in the first degree, conspiracy in the second degree, possession of a firearm during the commission of a felony, and possession of a deadly weapon by a person prohibited.

Mr. Giles died in Massachusetts in January 2008, four months before trial. Pretrial, the State filed a motion *in limine* seeking to exclude any out of court statements made by Giles, including both his February 3 statement identifying Mitchell as the shooter and his late February statement in which he failed to identify Purnell as one of the assailants in a photo array. The State argued, anticipating Purnell's objection, that Giles' statements were inherently unreliable and untrustworthy because Giles and Purnell may have conspired to rob Mrs. Giles, which ultimately resulted in her murder. Purnell opposed

the State's motion, arguing that Mr. Giles' statement identifying Mitchell as the shooter was admissible under Delaware Rule of Evidence 807 because *the State* had incorporated the identification within a sworn affidavit of probable cause for the Mitchell search warrant making the statement inherently "trustworthy." The trial judge found that the statements did not possess circumstantial guarantees of trustworthiness sufficient to be admissible under Rule 807 and granted the State's motion *in limine*.

At the close of the State's case, which relied largely on the testimony of Mitchell and Harris, Purnell moved to admit Giles' statement in which he failed to identify Purnell as one of the assailants in a photo array. As with his contention about Giles' statement identifying Mitchell, Purnell argued that this statement was admissible under Rule 807. Purnell argued the Giles' statement that failed to identify Purnell supported Harris' testimony that this was a random, unplanned crime, and that, Giles was not involved. Purnell claimed that Mr. Giles' statement was therefore trustworthy. The State argued that the statement did not possess sufficient indicia of reliability to be admitted under D.R.E. 807 because of the reasons supporting the State's motion *in limine* and because Giles did not identify Harris, (who admitted his involvement). The State argued that Giles' failure to identify Harris further supported the notion that he was somehow involved and no Giles' statement could be considered trustworthy. The trial judge denied Purnell's motion, thus barring any Giles' statement that failed to identify Purnell.

On April 24, 2008, the jury began deliberations. The next day, the jury foreperson presented the trial judge with a note indicating that Juror # 6 had informed his fellow jurors that he was unable to deliberate past that day because of a planned vacation. The trial judge questioned Juror # 6, who informed the trial judge that the entire jury was aware of the issue. Purnell moved for a mistrial, which the trial judge denied. The trial judge then convened the jury and instructed them not to consider Juror # 6's vacation plans during their deliberations and that they would continue deliberating through the evening or weekend, if necessary. The jury returned a verdict later that day finding Purnell guilty of the lesser included offense of murder in the second degree and all remaining counts.

## II. Discussion

### A. *The trial judge did not err by finding that Giles' out of court statements were inadmissible hearsay.*

Purnell first claims that the trial judge erred when she ruled that Mr. Giles' statements identifying Mitchell as the shooter and failing to identify Purnell as the shooter were inadmissible hearsay. He argues that the trial judge abused her discretion by finding that the statements lacked sufficient circumstantial guarantees of trustworthiness to be admitted under Rule 807.

 We review the trial judge's evidentiary rulings for an abuse of discretion.[2] To the extent that the issues on appeal implicate findings of fact, we conduct a limited review of the trial judge's factual findings to determine "whether there was sufficient evidence to support the findings and whether those findings were clearly erroneous."[3]

**2.** *Foster v. State*, 961 A.2d 526, 529 (Del. 2008) (citing *Tice v. State*, 624 A.2d 399, 401 (Del. 1993)).

**3.** *Jenkins v. State*, 970 A.2d 154, 157 (Del. 2009) (internal citation omitted).

■ " 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." [4] Hearsay may not be admitted unless the Delaware Rules of Evidence provides an exception for its admission or it is otherwise provided for by law.[5] The State and Purnell agree that Rule 807 residual exception is the only exception to the hearsay rule that could possibly have applied to allow Giles' statements to be admitted as substantive evidence. That exception provides:

A statement not specifically covered by Rule 803 or 804 but having equivalent circumstantial guarantees of trustworthiness is not excluded by the hearsay rule, if the court determines that: (A) The statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.... [6]

A trial judge must construe the requirements of Rule 807 narrowly so that the exception does not swallow the hearsay rule.[7] Thus, "[t]he Court must be satisfied that there is a guaranty of trustworthiness associated with the proffered hearsay statement that is equivalent to the guaranties of trustworthiness recognized and implicit in the other hearsay exceptions." [8]

■ In stark contrast to the indicia of reliability that are implicit in Rules 803 and 804, Giles' out of court statements identifying his wife's shooter were made several days after his perception of the attack [9] and after he had developed a motive to lie.[10] Immediately after the attack, Giles claimed that he could not identify his attacker. Only after he became aware that the police suspected that he was involved in his wife's death did Giles state that one of the attackers resembled Mitchell. Giles had a history of abusing his wife, had stolen from her before, and lied about his actions on the day of the murder. Given this context, Giles' statements contain none of the circumstantial guarantees of reliability that are implicit in Rules 803 and 804.

Purnell argues that in spite of Giles' faults, Giles became hysterical after his wife was shot, screamed for help, and cooperated with the police. Giles' reaction to his wife's shooting alone does not convince us that the trial judge erred by finding Giles' statements untrustworthy. The enormity of Mr. Giles' lies to the police taints Purnell's rather bold assertion that Giles' "cooperated" with police.

■ Purnell highlights that the police used Giles' statement identifying Mitchell in their affidavit of probable cause for a search warrant for Mitchell's apartment. Purnell believes that the police reliance on Giles' statement in order to obtain a search warrant for Mitchell's residence satisfies Rule 807's trustworthiness re-

---

4. D.R.E. 801(c).

5. D.R.E. 802.

6. D.R.E. 807.

7. *Cabrera v. State*, 840 A.2d 1256, 1268 (Del. 2004) (citing *Brown v. Liberty Mut. Ins. Co.*, 774 A.2d 232, 242 (Del.2001)).

8. *Stigliano v. Anchor Packing Co.*, 2006 WL 3026168, at *1 (Del.Super.) (citing *Idaho v. Wright*, 497 U.S. 805, 816, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990)); *accord Demby v. State*, 695 A.2d 1152, 1156–57 (Del.1997).

9. In contravention of D.R.E. 803(1)-(3), (5).

10. In contravention of D.R.E. 803(4)-(5).

quirement. That the police used Giles' tentative identification of Mitchell to obtain a search warrant does not conclusively establish Giles' credibility and trustworthiness. The affidavit of probable cause which must accompany a search warrant must set forth sufficient facts on its face "for a judicial officer to form a reasonable belief that an offense has been committed and that seizable property would be found in a particular place to support a finding of probable cause." [11] This test, however, is less rigorous than that governing the admission of evidence at trial.[12] A finding of probable cause only requires the proponent to show a probability, and not a *prima facie* showing, that criminal activity occurred.[13] Purnell offers nothing to support the contention that Giles' failure to identify Purnell carries some inherent sense of trustworthiness. As a result, the trial judge's finding that Giles' out of court statements lacked sufficient circumstantial guarantees of trustworthiness to be admitted under Rule 807 was supported by the record and not clearly erroneous.

### B. *The trial judge did not err by denying Purnell's motion for a mistrial.*

▮ Purnell next claims that the trial judge abused her discretion when she denied his motion for a mistrial. He contends that the trial judge should have granted a mistrial because a deadline imposed by a juror's vacation plans tainted the jury's deliberation process. We review the trial court's denial of a motion for a mistrial for abuse of discretion.[14]

During jury selection, two of the jurors informed the court that they had other commitments at the end of April and beginning of May, respectively. The jury began deliberations on the morning of Thursday, April 24. The next day, the foreperson sent out a note that Juror # 6 expressed concern about deliberations going past that day because he had vacation plans. The trial judge questioned Juror # 6 regarding his concern. Juror # 6 informed the trial judge that the other jurors were aware of his plans. He noted that the jury was "making progress" based on their deliberations and not on his imposed deadline. He informed the trial judge that the other jurors recognized that if they could not reach a decision that day then it would mean a hung jury.

Purnell then asked the trial judge to declare a mistrial because the jurors believed they faced a deadline for deliberations. The State opposed the motion, and requested that the trial judge instruct the jury not to consider juror # 6's vacation plans. The trial judge denied the motions and called the jury into the courtroom. The trial judge reminded the jury of their oath and informed them that only the trial judge could declare a hung jury. Then, the trial judge instructed the jury not to consider any juror's outside obligations and reminded the jury of their duty to consider only the evidence in the case. The jury returned its verdict later that day.

▮ The trial judge is in the best position to evaluate the risks of any alleged prejudice at trial. We will only reverse a trial judge's denial of a motion for mistrial if it is based upon "unreasonable or capricious grounds." [15] A mistrial is

---

11. *State v. Sisson*, 883 A.2d 868, 876 (Del.Super.2005); *see also* 11 *Del. C.* §§ 2306–07.

12. *Sisson*, 883 A.2d at 876; *Jensen v. State*, 482 A.2d 105, 112 (Del.1984).

13. *Sisson*, 883 A.2d at 876; *Jensen*, 482 A.2d at 112.

14. *Revel v. State*, 956 A.2d 23, 27 (Del.2008).

15. *Burns v. State*, 968 A.2d 1012, 1018 (Del. 2009); *Revel*, 956 A.2d at 27.

warranted "only when there is manifest necessity"[16] and "no meaningful and practical alternatives."[17] A trial judge's prompt curative instructions are presumed to cure error and adequately direct the jury to disregard improper matters for consideration.[18] Juries are presumed to follow the trial judge's instructions.[19]

■ Purnell contends that the trial judge improperly allowed the jury to rush to judgment in order to avoid a hung jury. Haste or shortness of time taken by a jury in arriving at its verdict does not invalidate the verdict.[20] In *Styler v. State*, the jury began deliberations at 4:15 p.m. on Thanksgiving Eve.[21] At 5:45 p.m., the trial judge suggested to the jury that it could recess until Monday, but the judge did not recommend that option.[22] Rather than breaking, the jury continued to deliberate and returned a verdict at 11:03 p.m. that evening.[23] The defendant argued that the trial judge abused his discretion by permitting or forcing an inherently coercive schedule on deliberations.[24] On appeal, we explained that "a conviction must be reversed if the judge's conduct towards the jury 'in its context and under all the circumstances' had a coercive effect."[25] Applying that test to the facts of *Styler*, we

found that the trial judge did not force the jury to continue deliberating and, under the time frame in which the case was tried and issues put to the jury, the circumstances were not coercive as a matter of law.[26] In this case, nothing indicates that the trial judge's instruction to the jury inherently coerced time constraints on the deliberative process. At no point did the trial judge indicate that the process required a verdict by a specific time or a certain day, and the trial judge's instruction clearly told the jurors that their duty required them to deliberate without regard for Juror # 6's vacation plans. The trial judge did not pressure the jury to reach a verdict within any time frame. The trial judge's prompt instruction concerning a single juror's vacation plans provided a "meaningful and practical alternative to a mistrial."

Therefore, we **AFFIRM** the judgment of the Superior Court.

---

16. *Burns*, 968 A.2d at 1018 (quoting *Chambers v. State*, 930 A.2d 904, 909 (Del.2007)).

17. *Id.* (quoting *Dawson v. State*, 637 A.2d 57, 62 (Del.1994)).

18. *Pena v. State*, 856 A.2d 548, 551 (Del. 2004).

19. *Fuller v. State*, 860 A.2d 324, 328 (Del. 2004).

20. *See Moore v. State*, 1992 WL 354222, at *2 (Del.); *Styler v. State*, 417 A.2d 948, 951 (Del. 1980).

21. *Styler*, 417 A.2d at 951.

22. *Id.*

23. *Id.*

24. *Id.*

25. *Id.* (quoting *Jenkins v. United States*, 380 U.S. 445, 446, 85 S.Ct. 1059, 13 L.Ed.2d 957 (1965)); *accord Younger v. State*, 496 A.2d 546, 553 (Del.1985).

26. *Styler*, 417 A.2d at 951.