**IN THE SUPERIOR COURT OF THE STATE OF DELAWARE**

STATE OF DELAWARE,              )
                               )
        v.                     )        ID No. 0701018040
                               )
MARK PURNELL,                  )
                               )
        Defendant.             )

## OPINION

In May of 2018, Defendant Mark Purnell ("Purnell") filed a second Motion for Postconviction Relief (the "Motion")[1] pursuant to Superior Court Criminal Rule 61 ("Rule 61"). In the Motion, Purnell seeks a new trial claiming new evidence exists which raises a strong inference that he is innocent in fact of the acts that underlie his conviction in this case. Additionally, Purnell raises claims that he acknowledges are procedurally barred under the current version of Rule 61, but contends that the previous version of the Rule properly applies to his Motion and allows for consideration of those claims. The Court finds no basis under the law for the application of the pre-amendment version of Rule 61. Therefore, Purnell's claim of actual innocence is the only claim that was considered by the Court. After consideration, the Court finds that Purnell's claim of actual innocence does not raise a strong inference that he is innocent in fact of the underlying acts that led to his

---

[1] D.I. 119.

convictions and thus, his Rule 61 Motion is hereby DENIED.

## I. FACTUAL AND PROCEDURAL BACKGROUND[2]

In the evening of January 30, 2006, Ernest and Tameka Giles were walking near Fifth and Willing Streets in Wilmington carrying several shopping bags.[3] The married couple were on the way to their apartment when two young men approached them and demanded money. Mrs. Giles refused to give up her belongings and kept walking. One of the young men then fired a single shot, hitting Mrs. Giles in the back. She fell to the ground and Mr. Giles screamed for help. The two men fled the scene. Officers from the Wilmington Police Department responded to the scene and paramedics transported Mrs. Giles to the Christiana Hospital where she died from her injuries.[4]

Shortly after the shooting, police had discovered a number of facts that led them to believe that Mr. Giles might have had some involvement in the incident. He then became a person of interest in the investigation of his wife's murder. Mr. Giles had a history of domestic violence directed against his wife.[5] The police discovered that Mr. Giles lied to them about his reason for being in the vicinity of the shooting

---

[2] Purnell's claim of actual innocence, and the corresponding burden of proof, necessarily require a full consideration of the factual background of the case. Hence, the Court will summarize all of the facts—those that were developed through police investigation, incriminating and exculpatory evidence, and the facts as they were presented at trial—to aid in this analysis. *State v. Sykes*, 2017 WL 6205776 (Del. Super. Dec. 7, 2017) (citing *House v. Bell*, 547 U.S. 518, 538 (2006)); *see also, Schlup v. Delo*, 513 U.S. 298 (1995) (The requirement that the new evidence create a "strong inference" of actual innocence has been defined by case law to require a finding "based on all the evidence, that it is more likely than not that no reasonable juror would have convicted the movant of the crime").

[3] *Purnell v. State*, 979 A.2d 1102, 1104 (Del. 2009).

[4] *Id.*

[5] *Id.*

2

and about his whereabouts after Mrs. Giles died in the hospital. The police also discovered that Mrs. Giles had made statements that her husband had stolen her tax refund in 2005. Additionally, only a day or two before the murder, Mrs. Giles had received a tax refund check in the amount of $1700, which was unaccounted for. Mr. Giles lied to the police about how they spent the refund check.[6]

During his interview with police on February 3, 2006, Mr. Giles first told police that he did not believe that he would be able to recognize the perpetrators unless they were dressed the same way that they had been at the time of the crime.[7] Later, while alone in the interview room, Mr. Giles made several cell phone calls and indicated to his callers that the police viewed him as a suspect.[8] After this, the police asked Mr. Giles to look at a photo array, which did not contain Purnell's photo. Mr. Giles selected two pictures that he stated, taken in combination, were "close" to what one of the perpetrators looked like, but only if the men in the photos were 5'4" or 5'5" in height.[9]

On February 16, 2006, police interviewed Mr. Giles a third time. During that interview, Mr. Giles stated that he had only seen the shooter from the side and that the shooter was wearing a hat.[10] He then selected two more photographs that he said

---

[6] *Purnell*, 979 A.2d at 1104.
[7] *Id.*
[8] *Id.* at 1104-5.
[9] *Id.* at 1105.
[10] *Id.*

looked similar to the shooter.[11]  One of those photos was of Kellee Mitchell ("Mitchell").  Mr. Giles then pointed to the picture of Mitchell and said, "it might have been him," and that between the two photos, the shooter looked most like this one.  Then, after some hesitation, he said that he could be wrong, it might have been the other one.[12]  After a full investigation, the police eventually determined that Purnell and Ronald Harris were responsible for the murder of Tameka Giles

## A. Trial of Purnell

Mark Purnell and his co-defendant, Ronald Harris ("Harris") were each charged with (1) Felony Murder in the First Degree, (2) Attempted Robbery in the First Degree, (3) Conspiracy in the Second Degree, (4) Possession of a Firearm During the Commission of a Felony, and (5) Possession of a Deadly Weapon by a Person Prohibited.[13]  On April 7, 2008, one week before trial and immediately after a jury had been selected, Harris pled guilty to Attempted Robbery in the First Degree and Conspiracy in the Second Degree.[14]

## THE STATE'S CASE IN CHIEF

At trial, the State called fifteen witnesses.[15]  On April 14, 2008, the State

---

[11] *Purnell*, 979 A.2d at 1105.

[12] *Id.*

[13] *Id.*

[14] Tr. 44-45 (Apr. 7, 2008).  Harris' plea agreement meant that Harris' brother, Dawan Harris, would no longer be called as witness in Harris' case in chief.  Purnell's counsel formerly represented Dawan Harris, and informed the Court that there may be a conflict of interest if Dawan needed to be called as a witness in Purnell's defense.  The Court reserved its decision on whether a conflict existed until Purnell's counsel decided that Dawan Harris needed to testify.  Ultimately, Purnell's counsel decided not to call Dawan Harris, and the Court never ruled on the conflict.

[15] *See* Trial Trs.

called the only available eyewitness to the crime, Angela Rayne ("Rayne").[16] Rayne testified that she was sitting on her stoop at the intersection of Fifth and Willing Streets when she saw the teenagers walk past her, turn around, and pass her again, both times at a distance of about 10 feet.[17] She stated that she could not see their faces clearly because it was dark and they had hoods on, but she recognized one of them as the "boy that got locked up on Jefferson" earlier that day.[18] Rayne testified that she saw the couple, later determined to be Tameka and Ernest Giles, walking up the street towards her and the two teenagers. Seconds later, when she heard a single gunshot, she looked over and saw the woman on the ground and the two teenagers running away. In response to questioning from both the State and Purnell's counsel, Rayne testified that she was smoking $500 worth of crack every day and that she was under the influence when she spoke to the police.[19]

The State then called Detective Tabor, the lead investigator of Mrs. Giles murder.[20] He testified that after interviewing Rayne, he checked the records for persons having police contact on Jefferson Street that day. Detective Tabor found Harris' name and printed out a photo-lineup that included Harris' picture.[21] Upon showing the photos to Rayne, she immediately identified Harris as one of the

---

[16] Tr. 81 (Apr. 14, 2008). Mr. Giles, the only other eyewitness to the crime, died of natural causes in January of 2008. Tr. 29 (Apr. 8, 2008).
[17] Tr. 81-122 (Apr. 14, 2008).
[18] *Id.*
[19] *Id.*
[20] Tr. 117-121 (Apr. 15, 2008).
[21] *Id.*

5

teenagers.[22] Detective Tabor testified that Rayne said she was "100 percent" certain about her identification of Harris.[23] Tabor reported that, on February 18, 2006, Purnell was in the apartment with Harris when the police executed an arrest warrant on Harris.[24]

On the second day of trial, the State called Kellee Mitchell, who testified that he had known Purnell for about 10 years.[25] The State elicited testimony about Mitchell's potential motivations for testifying, including that he was initially a suspect for the murder and that the police agreed to drop charges for his testimony.[26] Mitchell testified that while he and Purnell were incarcerated, Purnell talked about having robbed someone on January 30, 2006. Mitchell, however, testified that he did not remember Purnell ever talking about a murder.[27] While on the stand, Mitchell failed to recollect several details of a pre-trial conversation that he had with Detective Tabor. Mitchell did testify, however, that he did remember talking to Detective Tabor and that those statements were voluntary and truthful.[28] The State then recalled Detective Tabor who testified that Mitchell stated he had a conversation with Purnell where Purnell admitted to robbing and killing Mrs. Giles. The State, thereafter, played a recording of Mitchell's statement to Detective Tabor

---

[22] *Id.*
[23] *Id.*
[24] Tr. 156 (Apr. 14, 2008).
[25] Tr. 16 (Apr. 15, 2008).
[26] Tr. 13-16 (Apr. 15, 2008).
[27] Tr. 17-21 (Apr. 15, 2008).
[28] Tr. 24-28 (Apr. 15, 2008).

6

pursuant to 11 *Del.C.* § 3507 ("§3507").[29]  The State also played a recorded telephone call between Purnell and Mitchell's brother, Tremont Mitchell, in which Purnell stated that he had "a lot" to do with the murder.[30]

Trial counsel for Purnell cross-examined Mitchell on his potential motivations for testifying falsely, including the fact that he was originally a suspect in the case and that the police agreed to drop his gun charge in exchange for testimony.[31] Purnell's counsel also questioned him about his acquisition of the .38 revolver that he shared with Dawan Harris.[32]

Next, the State introduced written phrases on a plywood board from Purnell's bed at the Juvenile Detention Center.  A forensic handwriting expert, Georgia Carter, analyzed the writing and confirmed in her testimony that the phrases were written by Purnell.  Purnell had written on the board, "Kellee Mitch, snitching on me like that, d\*mn, n\*\*ga, you ratting, I got something for you and your child.  I'm going after baby's moms, grandmoms.  I'm going to make him pay for this sh\*t.  I can see if it was for something else, this is for a body…"[33]

On the third day of trial, Corey Hammond testified as a State's witness.[34]  The State elicited testimony from Hammond about his pending sentence on drug

---

[29] Tr. 41 (Apr. 15, 2008).
[30] *Purnell v. State*, 106 A.3d 337, 349 (Del. 2014).
[31] Tr. 80-81 (Apr. 15, 2008).
[32] Tr. 90 (Apr. 15, 2008).
[33] State's Ex. 18; Tr. 167 (Apr. 15, 2008); Tr. 148 (Apr. 14, 2008).
[34] Tr. 14 (Apr. 15, 2008).

7

convictions and about the agreement he made with the State to reduce his remaining prison time to probation in exchange for his truthful testimony.[35] Hammond testified that he saw Purnell and Harris together on the day of the murder at Harris' aunt's house on Sixth and Washington Streets. He testified that Purnell complained of being broke, that Harris asked him what he was going to do about it, and that Purnell had a gun in his waistband.[36] Hammond said he left Harris' aunt's house to go to his house on Fifth and Jefferson when, about an hour later, he heard the gunshot. He ran to the scene and saw Mrs. Giles on the ground, but did not see Harris or Purnell. Hammond then testified that he saw Purnell and Harris a week later and asked them what happened. He stated that Purnell replied, "I told the b*tch to give it up, she didn't want to give it up so I popped her."[37]

The State called Etienne Williams, Mitchell's girlfriend at the time of the murder. She testified that she overheard a phone call in which Purnell told Dawan Harris' girlfriend, Aqueshia Williams, "I did kill the lady and your boyfriend is sitting in jail for it."[38] She testified that her mother, Michele Williams, received a letter from Purnell that said "Just tell Kellee Mitchell, run, run, run as fast as he can."[39] On cross-examination, Etienne testified that Mitchell told her he "wasn't

[35] Tr. 16-19 (Apr. 16, 2008).
[36] Tr. 13-47 (Apr. 16, 2008).
[37] Tr. 37 (Apr. 16, 2008).
[38] Tr. 115-116 (Apr. 16, 2008).
[39] Tr. 125-126 (Apr. 16, 2008).

going to go down for no murder charge," which established that Mitchell knew he was a suspect for the murder of Mrs. Giles.[40]

The State then called Aqueshia Williams, Etienne's sister and Dawan Harris' ex-girlfriend. Aqueshia testified that she was on the phone call with Purnell which Etienne Williams had overheard. She testified that Purnell stated, "their mans [sic] are in jail for something that I did."[41] The State played a video statement from Aqueshia, in which she claimed that Purnell warned her and her sister to keep quiet about his involvement in the murder by stating, "I shot one b*tch, I'll kill another."[42] Aqueshia then corroborated the letter that Etienne referenced, including the warning directed to Mitchell.[43]

On April 17, 2008, the State called Corporal Dempsey of the Wilmington Police Department who testified that he collected the bullet casing from the scene of the murder.[44] He testified that he took a measurement from the far side of the intersection of Fifth and Willing Streets to the bullet casing that totaled 60 feet, 11 inches. Dempsey also testified that Mrs. Giles had received a partial tax check on January 30, 2006 for $1,748 that she had cashed earlier that day.[45] On cross-examination, Purnell's counsel elicited testimony from Dempsey that (1) Mitchell

---

[40] Tr. 169-171 (Apr. 16, 2008).
[41] Tr. 188 (Apr. 16, 2008). On cross-examination, Aqueshia acknowledged that Purnell said "sike" after he made the incriminating statement, to convey that he was joking. Tr. 189-190 (Apr. 16, 2008).
[42] *Purnell v. State*, 106 A.3d 337, 349 (Del. 2014).
[43] Tr. 190-192 (Apr. 16, 2008).
[44] Tr. 44 (Apr. 17, 2008).
[45] Tr. 56 (Apr. 17, 2008).

was a suspect in the murder, (2) that Dawan Harris was Ron Harris' brother, (3) that Dawan Harris and Mitchell were arrested together, and (4) that the police found a .38-caliber revolver that Dawan and Mitchell shared outside the apartment that they were arrested in.[46] Dempsey further testified that Rayne did not identify Mark Purnell in the photo lineup.[47]

The State then called Ronald Harris. Harris testified that he was originally co-indicted in this case and that he accepted a plea offer from the State. He testified that he pled guilty to Attempted Robbery in the First Degree and Conspiracy in the Second Degree.[48] Harris testified that, as part of his plea agreement, he agreed to testify in the case against Purnell.[49] Harris stated that he had only met Purnell once before January 30, 2006. On the day of the murder, Harris stated that he and Purnell had talked about committing a robbery earlier in the day. He also stated that he was detained and searched by the police on Fifth and Jefferson Streets earlier in the day.[50] Harris further testified that he met up with Purnell later that day at Compton Towers and that they walked up Fifth Street together where they saw a black man and woman in their late-thirties get off the bus around Fifth and Willing Streets with store bags.[51] Harris testified that they approached the two people and Purnell said "Can I get ya'll

---

[46] Tr. 78-81 (Apr. 17, 2008).
[47] Tr. 85 (Apr. 17, 2008).
[48] Tr. 134 (Apr. 17, 2008).
[49] Tr. 135 (Apr. 17, 2008).
[50] Tr. 137-139 (Apr. 17, 2008).
[51] Tr. 142-144 (Apr. 17, 2008).

stuff?" as he pulled out a gun from his waist band.[52] When Harris saw the gun, he turned and ran before hearing a shot about five seconds later.[53]

Harris testified that he lied in his first interview with the police when he said he was not involved in the shooting and that he did not know Purnell.[54] He then testified that he told Detective Tabor the truth in his subsequent interview. The State introduced the statements from Harris' second interview through §3507.[55] He testified that he ran away because the robbery was not supposed to involve anyone getting hurt.[56] On cross examination, Harris stated that he did not know Purnell until the day of the murder, and that he was offered a plea deal that he could not refuse.[57] There was also testimony in the record that, at best, demonstrated or, at least, suggested that Harris had a learning deficiency.[58] Indeed, at one point during his testimony, Harris stated that he could not read a document that the prosecutor handed him to aid his recollection.[59]

At the close of the State's case, Purnell moved to admit Mr. Giles' statement in which he failed to identify Purnell as one of the assailants in a photo array.[60] The

---

[52] Tr. 144-145 (Apr. 17, 2008).
[53] Tr. 147 (Apr. 17, 2008).
[54] Tr. 153-156 (Apr. 17, 2008).
[55] Tr. 160 (Apr. 17, 2008).
[56] Tr. 161 (Apr. 17, 2008).
[57] Tr. 175 (Apr. 17, 2008).
[58] Detective Tabor stated that Harris said, in response to a question about why Purnell shot Giles, "Because he told so many people about it." Tr. 168 (Apr. 17, 2008). Purnell contends that such a statement is incoherent and demonstrates that Harris had a learning disability. D.I. 141, Defendant's Post-Procedural Hearing Brief, 17.
[59] Tr. 177 (Apr. 17, 2008).
[60] Purnell, 979 A.2d at 1106.

11

trial court denied the motion. The Delaware Supreme Court summarized the arguments made on the motion as follows:

> "As with his contention about Giles' statement identifying Mitchell, Purnell argued that this statement was admissible under Rule 807. Purnell argued the Giles' statement that failed to identify Purnell supported Harris' testimony that this was a random, unplanned crime, and that, Giles was not involved. Purnell claimed that Mr. Giles' statement was therefore trustworthy. The State argued that the statement did not possess sufficient indicia of reliability to be admitted under D.R.E. 807 because of the reasons supporting the State's motion *in limine* and because Giles did not identify Harris, (who admitted his involvement). The State argued that Giles' failure to identify Harris further supported the notion that he was somehow involved and no Giles' statement could be considered trustworthy. The trial judge denied Purnell's motion, thus barring any Giles' statement that failed to identify Purnell."[61]

## DEFENDANT'S CASE IN CHIEF

On April 21, 2008, Purnell introduced witnesses in his defense. Purnell's counsel called Dawnell Williams, who testified that she heard two gunshots between 5:30 pm and 7:30 pm on the date of the murder. She stated that she saw two men running down Fifth Street toward her before they got into a Toyota and drove away.[62] She further testified that she had heard over a hundred gunshots during her tenure working for the Salvation Army on Fifth and Orange Streets.[63]

Purnell's counsel then called Latoya Moody, who testified that both Harris and Purnell are her younger cousins.[64] She testified that she remembered Purnell

---

[61] *Purnell*, 979 A.2d at 1106.
[62] Tr. 16 (Apr. 21, 2008).
[63] Tr. 13-15 (Apr. 21, 2008).
[64] Tr. 32 (Apr. 21, 2008).

shooting himself in January of 2006 and that he was on crutches for two to three weeks.[65] She testified that Harris and Purnell never socialized and that Purnell needed crutches to walk around on February 18, 2006.[66] She testified on cross examination that Purnell could not stand on his injured leg.[67]

Purnell's counsel then called Marline Smith, a friend of Purnell's grandmother, who testified that she saw Purnell on January 30, 2006 in a reclining chair at his grandmother's apartment with his leg elevated.[68] Smith said that Purnell was in the chair from 5:30 pm when she arrived, to 10:30 pm when she left.[69]

Doris Honie ("Honie"), Purnell's grandmother, was called as a defense witness. She testified that Purnell was in the chair the entire night of January 30, 2006 and that he could not walk.[70] Honie testified that Purnell could not walk at all for five or six days after his surgery, and that he did not receive crutches until about a week after surgery.[71] She further testified that Purnell never left her apartment from January 23 to February 6, 2006. Beginning in 2007 and continuing through 2008, Honie sent at least 22 envelopes to Purnell. When asked about the letters on cross examination, Honie stated that she never wrote any letters to Purnell and that she only sent him money orders. When the State quoted one of the letters in which

---

[65] Tr. 36-37 (Apr. 21, 2008).
[66] Tr. 41-44 (Apr. 21, 2008).
[67] Tr. 79 (Apr. 21, 2008).
[68] Tr. 88 (Apr. 21, 2008).
[69] Tr. 88-93 (Apr. 21, 2008).
[70] Tr. 140-142 (Apr. 21, 2008).
[71] Tr. 146-147 (Apr. 21, 2008).

Honie talked about how Purnell was falsely accused and that she knew he was in the apartment on January 30, 2006, Honie testified that she forget she sent any letters.[72]

The last defense witness, George White, a youth rehabilitation counselor from Ferris Detention Center, testified that he saw Purnell using crutches while he was at the Detention Center from February 1 to February 3, 2006. On cross-examination, the State authenticated a family court document through White to show that Purnell was out of his grandmother's apartment from February 1 to February 3, 2006.[73]

## STATE'S REBUTTAL CASE

The defense rested, and the State called three witnesses on rebuttal. Doctor Rubano, one of the surgeons who operated on Purnell's gunshot wound, testified that he could not state with medical certainty whether or not Purnell would have been able to walk on January 30, 2006.[74] He testified that Purnell did not cooperate with any follow up appointments, and that he was unable to contact anyone in Purnell's family to coordinate post-surgery treatment.[75] On cross-examination, he categorized Purnell's surgery as a serious surgery.[76] Also on cross examination, Dr. Rubano demonstrated the procedure of the surgery using Purnell's knee as a prop. The jury was shown the scars Purnell had from the surgery.[77] Purnell's counsel

---

[72] Tr. 183-210 (Apr. 21, 2008).
[73] Tr. 25 (Apr. 22, 2008).
[74] Tr. 35-36 (Apr. 23, 2008).
[75] Tr. 29-32 (Apr. 23, 2008).
[76] Tr. 40 (Apr. 23, 2008).
[77] Tr. 44-57 (Apr. 23, 2008).

14

introduced a report by a physical therapist, that was interpreted by Dr. Rubano, which stated that Purnell had refused crutches and wanted to be given a wheelchair after his operation.[78] Dr. Rubano testified that Purnell would have had about 13 staples to close the three incisions around his knee from the surgery.[79] On re-direct, Dr. Rubano read from a nurse's report from January 22, 2006, at 9pm that said that Purnell did not have any complaints of pain at that time.[80]

On April 24, 2008, the jury began deliberations.[81] On April 25, 2008, the jury returned a verdict finding Purnell guilty of the lesser included offense of Murder in the Second Degree and all of the remaining counts.[82] On October 17, 2008, this Court sentenced Purnell to an aggregate of 77 years at Level V incarceration, suspended after 45 years for decreasing levels of probation.[83] Purnell filed a timely notice of appeal.[84]

## B. Appeal and First Rule 61 Motion

On direct appeal, Purnell challenged the exclusion of Mr. Giles' statements as inadmissible hearsay and the denial of his motion for a mistrial as a result of juror

---

[78] Tr. 58-60 (Apr. 23, 2008).

[79] Tr. 62 (Apr. 23, 2008).

[80] Tr. 64 (Apr. 23, 2008).

[81] The next day, the jury foreperson presented the trial judge with a note indicating that Juror # 6 had informed his fellow jurors that he was unable to deliberate past that day because of a planned vacation. The trial judge questioned Juror # 6, who informed the trial judge that the entire jury was aware of the issue. Purnell moved for a mistrial, which the trial judge denied. The trial judge then convened the jury and instructed them not to consider Juror # 6's vacation plans during their deliberations and that they would continue deliberating through the evening or weekend, if necessary. *Purnell*, 979 A.2d at 1106.

[82] *Id.*

[83] *Purnell*, 106 A.3d 337, 339 (Del. 2014).

[84] D.I. 56.

15

misconduct.[85] The Delaware Supreme Court reviewed the Superior Court's rulings for abuse of discretion and found that the Judge did not abuse her discretion in either ruling.[86] On August 25, 2009, the Supreme Court affirmed the rulings of the Superior Court and the judgment of conviction.[87]

On March 25, 2010, Purnell filed his first motion for postconviction relief pursuant to Rule 61.[88] He subsequently retained postconviction counsel and an amended motion was filed on October 11, 2011.[89] In the amended motion for postconviction relief, Purnell raised three grounds, all alleging ineffective assistance of trial counsel.[90] Upon initial review of the motion for recommendations to the Superior Court, the Commissioner found:

> Turning now to the subject case, whether or not defense counsel was a flawless strategist, it is clear from a thorough and complete review of the record that defense counsel provided active and capable advocacy. Indeed, the record reflects that defense counsel consistently, vigorously and diligently defended the charges against Purnell. When reviewing the entire proceeding, the record reflects counsel's overall performance as being active, diligent, thorough and capable advocacy.[91]

---

[85] *Purnell*, 979 A.2d at 1103-1104.
[86] *Id.* at 1109. The Court held that Mr. Giles' statements did not have sufficient circumstantial guarantees of reliability sufficient to admit the statements into evidence. On the denial of the motion for mistrial, the Court found that the trial judge's curative instructions were a meaningful and practical alternative to a mistrial and did not coerce time restraints on the jury's deliberative process. *Id.*
[87] *Id.*
[88] D.I. 85.
[89] D.I. 95.
[90] *State v. Purnell*, 2012 WL 2832990 (Del. Super. Jul. 3, 2012).
[91] *Id.* at *5.

Thus, the Commissioner recommended that Purnell's motion be denied.[92]

The Superior Court conducted a *de novo* review of the motion and affirmed the Commissioner's Recommendation.[93] The Court held that Purnell's claims were without merit.[94] Purnell appealed, and the Delaware Supreme Court affirmed the Superior Court's denial after another *de novo* review.[95]

## C. Procedural History of this Motion

On May 14, 2018, Purnell filed his second Motion for Postconviction Relief (the "Motion")[96] with the assistance of counsel which consists of a 78-page brief and four volumes of exhibits. Purnell's Motion raises ten claims:

1. Mark Purnell's Actual Innocence

2. Counsel Rendered Constitutionally Ineffective Assistance in Violation of Mark Purnell's Right to Counsel as Guaranteed by Del. Const. Art. 1, Sect. 7 and the 6th and 14th Amendments to the United States Constitution

3. Trial Counsel Failed to Investigate, Develop and Present Evidence Regarding Two Witnesses Who Implicated Dawan Harris to the Police

4. Trial Counsel Failed to Investigate, Develop and Present Evidence Showing the Testimony of Prosecution Witnesses was Coerced and Unreliable

5. Trial Counsel Failed to Investigate Mr. Purnell's Impossibility Defense and Investigate, Develop and Present Extensive Evidence of His Dependence on Crutches for Mobility

---

[92] *Id.* at *13.
[93] *State v. Purnell*, 2013 WL 4017401 (Del. Super. May 31, 2013).
[94] *Id.*
[95] *Purnell v. State*, 106 A.3d 337, 353 (Del. 2014).
[96] D.I. 119.

6. Failure to Object to Prosecutorial Misconduct

7. Mr. Purnell's Trial was Rendered Fundamentally Unfair by the Misconduct of the Prosecution

8. Mr. Purnell's Right to a Fair Trial was Violated

9. Appellate Counsel Was Ineffective for Failing to Raise Numerous Claims on Appeal

10. Mr. Purnell is entitled to a New Trial Because the Prejudicial Effects of the Cumulative Errors in His Case Undermined Confidence in the Verdict

On September 4, 2019, the Court heard oral argument on whether the 2005 or 2014 versions of Rule 61 should be applied to the analysis of Purnell's Motion. At the conclusion of the hearing, the Court granted Purnell's request for post-hearing briefing on the issues of which version of Rule 61 should be applied and whether an evidentiary hearing should be granted to further evaluate whether Purnell's claims overcome the Rule 61 procedural bars.[97]

In Purnell's Post-Procedural Hearing Brief[98] he contends that applying amended Rule 61 would violate the fair notice requirements discussed in *Bronshtein v. Horn*.[99] Purnell argues that the Court should follow *State v. Burroughs*[100] and apply the pre-amendment version of Rule 61 that was created in 2005. Under the 2005 version of the Rule, a successive motion subject to summary dismissal could

---

[97] The Court allowed 30 days for Purnell to submit a post-hearing brief, 30 days for the State to file a Response, and 15 days for Purnell to file a Reply.
[98] D.I. 141.
[99] 404 F.3d 700 (3rd Cir. 2005).
[100] 2016 WL 1436949 (Del. Super. Apr. 4, 2016).

18

be considered on the merits if the Court found that such consideration was "in the interest of justice."[101]  Additionally, the Court could consider any claim that had not been previously litigated if (1) the defendant claimed that the court lacked jurisdiction or (2) the motion raised a "colorable claim that there was a miscarriage of justice because of a constitutional violation that undermined the fundamental legality, reliability, integrity, or fairness of the proceedings leading to the judgment of conviction."[102]

The State's Response to Purnell's Post-Procedural Hearing Brief[103] cites multiple Delaware cases and contends that the Delaware Supreme Court has squarely addressed the constitutionality of applying the amended version of Rule 61 to similarly situated movants.[104]  Purnell filed a Reply which claims that the fair notice argument as applied to this case is an issue of first impression in Delaware.

The Court has reviewed all of the material submitted in this case, as well as trial transcripts and previous opinions.  The analysis that follows will first address the correct version of Rule 61 to apply to Purnell's Motion before turning to Purnell's asserted new evidence in support of his alleged actual innocence.

---

[101] Rule 61(i)(2) (2005) ("Repetitive motion.  Any ground for relief that was not asserted in a prior postconviction proceeding as required by subdivision (b)(2) of this rule, is thereafter barred, unless consideration of the claim is warranted in the interest of justice").
[102] Rule 61(i)(5) (2005).
[103] D.I. 141.
[104] D.I. 142.

## II. DISCUSSION

Prior to addressing the merits of a Rule 61 motion, this Court must first consider and apply the procedural bars set forth in Rule 61.[105] The State argues that Purnell's Motion is procedurally barred under the current version of Rule 61(d)(2). The Rule provides:

> (2) *Second or subsequent postconviction motions.* A second or subsequent motion under this rule shall be summarily dismissed, unless the movant was convicted after a trial and the motion either:
>
> (i) pleads with particularity that new evidence exists that creates a strong inference that the movant is actually innocent in fact of the acts underlying the charges of which he was convicted; or
>
> (ii) pleads with particularity a claim that a new rule of constitutional law, made retroactive to cases on collateral review by the United States Supreme Court or the Delaware Supreme Court, applies to the movant's case and renders the conviction or death sentence invalid.[106]

Thus, if a defendant files more than one Rule 61 Motion, every second or subsequent motion shall be summarily dismissed, unless the Motion meets one or both exceptions under Rule 61(d)(2)(i) or (ii). Summary dismissal means that the Court rejects the motion without ruling on the merits of the claims raised within it.

The determination of which version of Rule 61 applies is dispositive of which

---

[105] *Durham v. State*, 2017 WL 5450746, at *1 (Del. Nov. 13, 2017).
[106] Super. Ct. Crim. R. 61(d)(2).

claims in the Motion will be considered. If the 2014 version properly applies to the Motion, all claims that do not assert new evidence of actual innocence or new retroactively applicable law will be summarily dismissed. However, if the 2005 version applies, the Court may rule on otherwise barred claims if it determines that the Motion warrants consideration under one of the two exceptions.

## A. Current Version of Rule 61 Applies

The current version of Rule 61 was created by order dated June 4, 2014.[107] The relevant change to the Rule made in the 2014 amendment was the elimination of two exceptions to the Rule's procedural bars. Notably, the Order provides "This amendment shall be effective on June 4, 2014 and shall apply to postconviction motions filed on or after that date."[108]

### 1. *State v. Burroughs*

Purnell claims that the procedural posture of his Motion is akin to the unique circumstances that warranted the application of the pre-amendment version of Rule 61 in *State v. Burroughs*.[109] The defendant in *Burroughs* was convicted, exhausted his appeals, and then brought his first motion for postconviction relief under Rule 61. In his motion, the defendant asserted ineffective assistance of counsel claims which were denied by the Superior Court. Burroughs tried to appeal the denial of

---

[107] *See* Order Amending Super. Ct. Crim. R. 61 (June 4, 2014).
[108] *Id.*
[109] 2016 WL 1436949 (Del. Super. Apr. 4, 2016).

21

his postconviction claims by filing again in the Superior Court per the advice of his post-conviction attorney. The deadline to appeal then expired before Burroughs was able to properly file in the Delaware Supreme Court.

Burroughs nonetheless filed an untimely appeal, and his post-conviction attorney sent a letter in response to an inquiry by the Clerk of the Court that admitted fault and ineffective assistance of counsel for misleading Burroughs to file in the wrong court. The Supreme Court held that it lacked jurisdiction to hear the appeal because of the time limit, but determined that:

> "[B]ecause the ineffective assistance of Burroughs' postconviction counsel deprived Burroughs of the opportunity to file an appeal from the denial of his first motion for postconviction relief under Rule 61, the Court will remand this matter to the Superior Court for the appointment of counsel to represent Burroughs in filing a second motion for postconviction relief under Rule 61.[110]

In the interim, on June 4, 2014, Rule 61 was amended to include the 61(i) bars, after Burroughs filed his first post-conviction motion, but before the Superior Court received the case on remand on April 4, 2016. Before the hearing, the parties stipulated that Burroughs' motion should be considered under the law as it existed at the time of remand. The law at the time of remand "allow[ed] counsel for Burroughs to conduct a full review [of] the record and, on or before May 2, 2015,

---

[110] *Burroughs v. State*, 91 A.3d 561, *1 (Del. 2014).

22

assert any and all claims of ineffective assistance of postconviction counsel that counsel believes are meritorious."[111]

On remand, the Superior Court determined that in the "unique procedural posture" that *Burroughs* presented, it would hear the merits of claims that would normally be barred by the current Rule 61(i) bars, because:

> "Since Burroughs' prior postconviction counsel filed the First Motion for Postconviction Relief on February 22, 2011, this Motion is governed by the version of Rule 61 that became effective on July 1, 2005, and not the current version of the Rule."[112]

Purnell's circumstances in this case differ from those in *Burroughs* because Purnell was able to appeal his first Rule 61 motion to the Supreme Court, and therefore was not deprived of the opportunity as was Burroughs. Also, whereas Burroughs' second motion was actually the same submission as his first Rule 61 motion on remand to Superior Court, Purnell's Motion is an entirely different submission following the affirmance by the Delaware Supreme Court of the denial of his first motion on appeal. Purnell's Motion was initiated in May 2018, well after the amendment to Rule 61. Therefore, the procedural posture of Purnell's Motion is substantially different than the unique circumstances presented in *Burroughs*, and does not merit the same "workaround" that was orchestrated in that case.

---

[111] *State v. Burroughs*, 2016 WL 1436949 at *2 (Del. Super. Apr. 4, 2016).
[112] *Id.* at n.11.

23

## 2. *Bronshtein v. Horn*

Purnell's reliance on *Bronshtein* is also unavailing. In *Bronshtein*, the United States Court of Appeals for the Third Circuit reviewed a petition for a writ of habeas corpus from Bronshtein, an inmate who had been convicted of Murder in the First Degree and sentenced to death under Pennsylvania criminal law.[113] On October 20, 1997, the judgment became final when the Pennsylvania Supreme Court denied certiorari.[114]

On June 9, 1999, Bronshtein filed a petition for relief under Pennsylvania's Post Conviction Relief Act ("PCRA").[115] Similar to Rule 61, the PCRA procedurally bars motions that were not filed within one year of the date of final judgment. Hence, Bronshtein had until October of 1998 to file his petition for postconviction relief. However, Pennsylvania courts had observed a long-standing practice of relaxing the procedural bar for inmates challenging sentences of death because of the "overwhelming public interest in preventing unconstitutional executions."[116] On November 23, 1998, the Pennsylvania Court issued a decision reversing this practice of leniency and declared that the procedural time bar would be strictly enforced going forward.[117] Thus, when the trial court received

---

[113] *Id.* at 700.
[114] *Id.* at 705.
[115] *Id.*
[116] *Id.* at 708.
[117] *Id.* at 709.

Bronshtein's untimely petition in 1999, it dismissed the petition and the Pennsylvania Supreme Court affirmed.[118]

Bronshtein then filed a petition for a writ of habeas corpus in the federal district court and appealed to the United States Court of Appeals for the Third Circuit. The attorneys for the Commonwealth of Pennsylvania argued that federal habeas review was barred because Bronshtein had procedurally defaulted in the Pennsylvania courts. The procedural default doctrine "precludes a federal habeas court from 'review[ing] a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and *adequate* to support the judgment'" (emphasis added).[119] The Court of Appeals held that for a state procedural rule to be adequate, it must have been "firmly established and regularly followed" by the time the petitioner defaulted. The court determined that the date of default is the date that the defendant could no longer file a timely petition.[120] The Court of Appeals concluded that the strict enforcement of the time bar had not been firmly established and regularly followed by October 20, 1998, and therefore was not an adequate state rule to preclude federal habeas review.[121]

---

[118] *Id.* at 706.

[119] *Id.* at 707 (quoting *Coleman v. Thompson*, 501 U.S. 722, 729 (1991)).

[120] *Id.* at 708.

[121] *Id.* at 709. The court suggested that Pennsylvania courts could have maintained an adequate procedural bar through the rule change if they employed a transitional rule that gave warning to potential filers that after a certain date, they would be strictly enforcing the time bar. *Id.*

Purnell argues that this Court should follow the analysis in *Bronshtein*, and that such analysis dictates that the 2005 version of Rule 61 applies. Both of Purnell's contentions are incorrect. The *Bronshtein* ruling is not controlling precedent, as was articulated in *State v. Taylor*.[122] Additionally, the standard employed in *Bronshtein* would not require the application of the 2005 version of Rule 61, because amended Rule 61 was firmly established and regularly followed when Purnell defaulted by filing his second motion for postconviction relief.

### (a) *Bronshtein* is inapplicable to this Court's determination

The *Bronshtein* decision is federal common law that is inapplicable in this case. The adequacy analysis conducted in that case is only relevant in the context of a federal court analyzing whether it has jurisdiction to rule on a petition for a writ of habeas corpus, when the state has dismissed the petitioner's claims pursuant to a state procedural rule.[123] This Court in *Taylor* held that "a procedural default claim is unripe because Taylor is not asking a federal court to review a state court's decision that Taylor's Motion was barred on procedural grounds."[124] Consistent with the circumstances in *Taylor*, Purnell is requesting this state Court to apply a federal

---

[122] 2018 WL 3199537.

[123] *State v. Taylor*, 2018 WL 3199537, *3 (Del. Super. 2018).

[124] The Court nevertheless conducted a federal procedural default analysis "for the sake of a complete record and efficient judicial review" and found that the fair notice principles did not entitle the Purnell to the previous version of Rule 61. Taylor was slightly different because it interpreted the procedural default claim as stated in *Fahy v. Horn*, 516 F.3d 169 (3d Cir. 2008), a predecessor to *Bronshtein* that did not make clear whether the date of default was when the defendant's deadline occurred or when the court applied the rule to the case. *See, Fahy v. Horn*, 516 F.3d 169 (3rd Cir. 2008).

procedural doctrine that only arises when a federal court reviews a petition for a writ of habeas corpus. However, this Court is not in the procedural posture where the *Bronshtein* decision applies. This Court is bound to apply Delaware state law and Delaware Supreme Court precedent unless the Court finds that the application of the law would violate the Delaware or United States constitutions. The Court does not so find and will continue in line with the several Delaware Supreme Court cases that have previously established the constitutionality of the application of the current version of Rule 61 in substantially the same scenario.[125]

The constitutionality of applying amended Rule 61 to movants whose judgment of conviction became final prior to the amending order was analyzed in *Turnage v. State*,[126] where the Delaware Supreme Court held:

> First, Turnage's argument that the amended Rule 61 denies her due process of law and meaningful access to the courts is without merit. The United States Supreme Court has held that "[s]tates have no obligation to provide [postconviction] relief." Thus, Turnage is arguing about the extent to which the State has afforded a right to postconviction relief that it does not have to afford at all. Therefore, the amended Rule 61 provides more due process and access to the courts than is constitutionally required. Moreover, the amended form of Rule 61 still provides a broad right to file a first petition within "one year after the judgment or conviction is final," and even allows successive petitions in the compelling

---

[125] "The Delaware Supreme Court has consistently held that the applicability of the post-June 2014 revision to Rule 61 to all Rule 61 motions filed on or after June 4, 2014, is not in violation of any constitutional rights." *State v. Mercer*, 2019 WL 1418061, *2-3 (Del. Super. Mar. 26, 2019) (citing *Turnage v. State*, 2015 WL 6746644 (Del. 2015); *Ploof v. State*, 2018 WL 4600814 (Del. 2018); *State v. Taylor*, 2018 WL 31999537 (Del.Super. Jun. 28, 2018), aff'd, 2019 WL 990718 (Del. 2019)).
[126] 127 A.3d 396 (Del. 2015).

27

circumstance when a person "pleads with particularity that new evidence exists that creates a strong inference that the movant is actually innocent" or "that a new rule of constitutional law, made retroactive to cases on collateral review …, applies to the movant's case." Turnage is not deprived of meaningful access to the courts just because she cannot collaterally attack a beneficial guilty plea more than a year after her conviction became final.[127]

*Turnage* and its progeny make it clear that the application of the current version of Rule 61 passes constitutional muster and does not violate Purnell's state or federal Due Process or other constitutional rights.

### (b) Even if the *Bronshtein* analysis applied, it would not implicate the 2005 version of Rule 61

Purnell's non-actual innocence claims are subject to at least two procedural bars under amended Rule 61, including the Rule 61(i)(1) time bar and the Rule 61(i)(2) successive motions bar. Purnell's judgment of conviction became final in 2009, which means he defaulted under the 1-year time bar when the deadline occurred in 2010, before the 2014 amendment. Purnell also defaulted under the successive motions bar when he filed his second Motion, because the act of filing a second motion triggers the Rule 61(i)(2) procedural bar. Purnell filed his second motion for post-conviction relief in May 2018.[128] Hence, the relevant date of default under a hypothetical *Bronshtein* adequacy analysis would be May 2018, when the

---

[127] *Turnage v. State*, 127 A.3d 396, *1 (Del. 2015); *see also*, *Ploof v. State*, 194 A.3d 908 (Del. 2018).
[128] D.I. 119.

amended version of Rule 61 had been in effect for nearly four years. Indeed, amended Rule 61 was firmly established and regularly followed when Purnell defaulted, making it an adequate state rule that precludes federal review. Therefore, even if the *Bronshtein* analysis applied, the 2014 version of Rule 61 would apply to determine the claims raised in Purnell's Motion.

## B. NEW EVIDENCE OF ACTUAL INNOCENCE

Because the Court finds that the current version of Rule 61 applies to Purnell's Motion, the only claim that is ripe for analysis is his actual innocence claim. Purnell claims that new evidence exists which creates a strong inference that he is innocent in fact of the underlying acts of his conviction. An actual innocence claim must be based on "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence [ ] that was not presented a trial."[129] For evidence to qualify as "new" under Rule 61, (1) it must be evidence that was discovered since trial, (2) could not have been discovered before trial with due diligence, and (3) is not merely cumulative or impeaching.[130] To prove that evidence could not have been discovered before trial with due diligence, Purnell must show that efforts were made to obtain the evidence in question, and that Purnell experienced difficulty that could not be overcome by the exercise of due diligence.[131]

---

[129] *State v. Sykes*, 2017 WL 6205776, *5 (Del. Super. Dec. 7, 2017) (citing *Phlipot v. Johnson*, 2015 WL 1906127, at *4 (D. Del. 2015)).
[130] *Hicks v. State*, 913 A.2d 1189, 1194 (Del. 2006); *Brown v. State*, 117 A.3d 568, 580 (Del. 2015).
[131] *Hicks*, 913 A.2d at 1195.

The phrase "strong inference" requires that based on all the evidence, it is more likely than not that no reasonable juror would have convicted the movant of the crime.[132] A court must consider "all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial."[133] In addition, a court "may consider how the timing of the submission [of actual innocence] and the likely credibility of the affiant [ ] bear on the probable reliability of that evidence."[134]

The new evidence that Purnell proposes roughly falls into one of six categories: (1) Kellee Mitchell recants his testimony; (2) Ronald Harris recants his testimony; (3) Corey Hammond recants his testimony; (4) New medical evidence of Purnell's inability to commit the crime; (5) New ballistic evidence showing that the shell casing was unrelated to the crime; and (6) New evidence of Dawan Harris and Kellee Mitchell's guilt. Purnell couches the new evidence within the evidence presented at trial to illustrate how the introduction of the purportednew evidence would have affected the jury's finding of guilt.

### 1. Kellee Mitchell's Recantation

Purnell submitted an affidavit from Kellee Mitchell in which Mitchell claims

---

[132] *Schlup v. Delo*, 513 U.S. 298 (1995); *see also, Phlipot v. Johnson*, 2015 WL 1906127, at *4 (D. Del. 2015) (must "persuad[e] the [court] that, in light of the new evidence, no juror acting reasonably, would have voted to find him guilty beyond a reasonable doubt." (internal citations omitted)); *see also, State v. Sykes*, 2017 WL 6205776 (Del. Super. Dec. 7, 2017) ("As it is not unreasonable for a juror to find these facts sufficient to convict Sykes of Rape, Sykes has failed to meet his burden to demonstrate actual innocence").
[133] *State v. Sykes*, 2017 WL 6205776 (Del. Super. Dec. 7, 2017) (citing *House v. Bell*, 547 U.S. 518, 538 (2006)).
[134] *Id.* (citing *Schlup*, 513 U.S. at 332).

that he never heard Purnell talk about the murder of Tameka Giles.[135] At trial, Mitchell claimed that he had talked to Purnell about a robbery, but did not remember Purnell talking about a murder. The State then introduced, through 11 *Del.C.* §3507, statements Mitchell made to Detective Tabor prior to trial in which he claimed Purnell had bragged about the murder. Purnell contends that Mitchell's affidavit is not the same as his in-court testimony because there is a difference between denying any recollection of Purnell's admission and remembering that Purnell did not admit to the murder.

To support the credibility of Mitchell's recantation, Purnell submitted written statements from two additional individuals. One is an affidavit from Dawon Brown, a third person who Mitchell claimed was present when Purnell bragged about the murder, which denies that such a conversation ever happened.[136] The other is a declaration from Andrew Moore, a co-inmate of Mitchell's, which states that Mitchell confessed to him after Purnell's trial that he lied when he implicated Purnell in the murder because he was young and scared.[137] Purnell argues that, under *Hicks v. State*,[138] Andrew Moore's declaration is not merely impeachment evidence because it offers the reason *why* Mitchell lied.

The State argues that Mitchell's affidavit is not new evidence because

---

[135] D.I. 119, Ex. 1, Aff'd of Kellee Mitchell.
[136] D.I. 119, Ex. 4, Aff'd of Dawon Brown.
[137] D.I. 119, Ex. 5, Decl. of Andrew Moore.
[138] 913 A.2d 1189 (Del. 2006).

31

Mitchell made essentially the same statements in his trial testimony. Notably, Mitchell writes in the affidavit that he "told the truth on the stand." The State points out that trial counsel for Purnell presented evidence to the jury arguing that Mitchell was not credible because he was once a primary suspect and did not want to serve a life sentence, and therefore, this new evidence would not change the result at trial. Also, the State argues that neither the Mitchell affidavit nor the Brown affidavit are new evidence because they concerned statements that were made before trial.

While the Court understands the difference between Mitchell's trial testimony and his affidavit, the Court does not believe that this subtlety transforms the affidavit into new evidence that would have a significant impact if introduced at trial. Mitchell's trial testimony, as well as the statements made in his affidavit are both presented as truthful.[139] Purnell acknowledges that the information in Dawon Brown's affidavit is not new when he writes in his Motion, "Neither defense counsel nor the detectives contacted Dawon Brown to confirm [Mitchell's] unsubstantiated account. Had they done so, they would have learned that this presumed conversation about the shooting... never took place."[140]

Also, Purnell's argument that Moore's declaration is new under *Hicks v. State* because it introduces *why* Mitchell lied in his trial testimony is unavailing. Moore's

---

[139] D.I. 119, Ex. 1, ¶ 4 ("I didn't care, I still told the truth on the stand, that I didn't know anything").
[140] D.I. 119 at 14.

32

declaration alleges that Mitchell confessed he lied because he was a suspect in the case. However, the jury was presented with this potential explanation when Purnell's trial counsel elicited testimony from Mitchell and Detective Tabor that Mitchell was originally a suspect. Hence, Moore's affidavit does not qualify as new because it is merely cumulative. Moreover, it does not present information that would likely change the outcome of trial. Therefore, Mitchell's affidavit does not qualify as new evidence that could create a strong inference of Purnell's actual innocence.

## 2. Ronald Harris' Recantation

Purnell argues that Ronald Harris' recantation of his trial testimony through his parent's affidavits qualifies as new evidence. Ronald Harris' mother's affidavit claims that (1) Harris told her he only testified so he could come home, (2) that Harris' testimony at trial was confused and did not make sense, and (3) that Harris had to take special education classes for the intellectually disabled when he was in school.[141] Harris' father's affidavit provides further statements about Harris' intellectual disabilities.[142]

Purnell contends that these affidavits should be viewed in concert with the fact that the jury did not appreciate the extreme interrogation tactics that were used

---

[141] D.I. 119, Ex. 6, Decl. of Shawn Harris.
[142] D.I. 119, Ex. 7, Decl. of Melvin Murphy.

to obtain Harris' confession.[143] These tactics included a seven-hour interrogation, alleged threats to Harris, false statements that Purnell implicated Harris in the murder, coupled with that fact that Harris was intellectually disabled. Purnell claims that Harris' second-hand recantation is credible because (1) his in-court testimony conflicted with his prior recorded statement, (2) his testimony did not match what the State claimed occurred, and (3) he is intellectually disabled.

The State argues that the evidence of Harris' recantation is not new because (1) Purnell's trial counsel presented a witness who testified that Harris and Purnell never socialized by the time of the murder,[144] (2) Harris was cross examined about the plea and the inconsistencies between his trial testimony and his prior statement,[145] and (3) the video of the interrogation and prior statements to police were available at the time of trial.[146] In addition, that State argues that the evidence is not an actual recantation because the affidavits are not from Harris but from his parents, and for that reason do not amount to a credible recantation. The State also contends that the affidavits do not refute Harris' trial testimony.

The Court finds that Purnell's evidence of Harris' recantation is not new evidence. In a decision on Purnell's first motion for postconviction relief, the Superior Court found, and the Supreme Court agreed, that there was "significant,

---

[143] D.I. 119 at 18.
[144] D.I. 129, State's Response, 22.
[145] *Id.* at 18; B88-89.
[146] D.I. 129 at 22.

additional information before the jury that substantiated [Harris'] testimony."[147]
Therefore, the affidavits from Harris' parents, which are mostly impeachment
evidence, likely would not change the result at trial. A fuller exposition of Harris'
intellectual deficiencies and the police interrogation tactics could have been
discovered before trial, and Purnell has not shown that he could not obtain such
information despite diligent efforts by trial counsel.

### 3. Corey Hammond's Recantation

Purnell submitted three affidavits to show that Corey Hammond recanted his
trial testimony. The first affidavit is from Alfred Lewis, a friend of Hammond's
family which states that he knows Corey Hammond's testimony was false from
talking to Hammond's father, Purnell's sister, and Hammond himself.[148] The second
affidavit is from Hammond's mother, Naco Hammond, which details the full nature
of Hammond's father's relationship with police as a long-time informant and his
involvement in getting Corey Hammond to lie.[149] The third affidavit is from
Hammond's brother, Troy Hammond, which claims that Corey Hammond was not
at the scene of the murder.[150] Although Purnell concedes that Troy's affidavit is not

---

[147] *Purnell v. State*, 106 A.3d 337, 348 (Del. 2014). "Given the independent evidence corroborating Harris' testimony, Purnell's counsel's vigorous efforts to undermine Harris' credibility at trial, and the jury instruction's general caution regarding "the motives influencing the witness" and the witness's "bias or prejudice or interest in the outcome of the litigation," we do not find that there is a reasonable probability that the jury's verdict would have changed had it heard the Bland instruction." *Id.* at 349.
[148] D.I. 119, Ex. 12, Aff'd of Alfred Lewis.
[149] D.I. 119, Ex. 13, Aff'd of Naco Hammond.
[150] D.I. 119 Ex. 14, Aff'd of Troy Hammond.

new evidence, he claims that it lends credibility to the other purported new evidence of the falsity of Hammond's trial testimony and knowledge of Purnell's involvement in the murder.[151]

The State argues that these affidavits are not new evidence, not credible, and would not change the result at trial. They do not qualify as new because Hammond's statements were available at trial and Purnell's trial counsel cross-examined Hammond about his original lack of knowledge which changed only when he had charges pending against him. The State further claims they are not new evidence because they are merely impeachment evidence in that they attack Hammond's credibility, which is insufficient under *Schlup*. Finally, the State argues that the affidavits are not a credible recantation because none of them are from Hammond directly.

The Court finds that Purnell's evidence of Hammond's recantation does not qualify as new evidence. The affidavits all attack the credibility of Hammonds' trial testimony making them witness impeachment evidence rather than evidence of Purnell's actual innocence. Further, the evidence is cumulative because Hammond's credibility was aggressively attacked on cross examination by Purnell's trial counsel.

### 4. New Medical Evidence

Purnell submitted a doctor's opinion that he claims is new evidence because

---

[151] D.I. 119, Ex. 14, Aff'd of Troy Hammond.

it states that Purnell was likely unable to run on the date of the murder, in contrast to the surgeon's trial testimony in which he stated that he did not see Purnell after surgery and therefore could not render an opinion. Purnell concedes that the medical evidence is new in type, not kind, from the medical evidence admitted at trial.[152] In his declaration, Dr. McGuigan stated that he "believes with reasonable medical probability that Mr. Purnell would have likely been unable to run unimpeded on January 30, 2006."[153] Purnell also submitted a declaration from William Davis which states that Purnell was dependent on crutches when he arrived at the NCC Detention Center and when he would change Purnell's bandages.[154] He also submitted a declaration from Khiry Brown that states that she saw Purnell on February 1, 2006 on crutches,[155] and a progress note from Ferris School that Purnell needed daily wound care from February 1st to 3rd, 2006.[156] Purnell claims that this medical evidence would likely change the result at trial because it shows that Purnell was physically incapable of committing the crime.

The State contends that none of this evidence is new and would not change the result at trial. Purnell's medical records were introduced at trial and Purnell called witnesses who testified that Purnell could not walk without crutches on the

---

[152] D.I. 142, Ex. A, Tr. of Oral Arg., 37 (Sept. 4, 2019).
[153] D.I, 119, Ex. 21, Decl. of Francis Xavier McGuigan, MD.
[154] D.I. 119, Ex. 23, Aff'd of William Davis.
[155] D.I. 119, Ex. 22, Aff'd of Khiry Brown.
[156] D.I. 119, Ex. 24, Ferris School Progress Note.

day of the murder.

The Court agrees that the evidence is not new in kind, and therefore is merely cumulative. The evidence does not qualify as new because the nature of Purnell's injuries could have been discovered at trial and Purnell does not show that he was unable to obtain such evidence despite his diligent efforts. Additionally, all of the medical evidence taken as a whole does not conclusively show that Purnell was physically unable to run on January 30, 2006.

### 5. New Ballistic Evidence

Purnell claims that newly obtained ballistic evidence reveals that a 9mm shell casing could not travel 50 feet after being ejected from a firearm. However, Purnell's postconviction counsel acknowledges the pre-trial availability of this evidence and that it is not new under Rule 61 standards when she states, "Had trial counsel consulted with a ballistics expert, he could have presented evidence that it was scientifically impossible for the 9mm casing…to be related to the murder of Ms. Giles."[157]

The State argues that the ballistics evidence is not new and points out that Purnell's trial counsel argued that the 9mm casing could not be linked to the crime and that the .38-caliber gun that Mitchell had could have been the murder weapon. The State contends that this ballistics report would not change the result at trial

---

[157] D.I. 119 at 42.

because the 9mm casing was never an essential part of the State's case and Purnell's trial counsel conceded that the core issue of the case was the identity of the shooter.

The Court agrees that the ballistic evidence is not new because it was available at the time of trial and Purnell was not denied such evidence despite diligent efforts to obtain it. The ballistic evidence likely would not change the result at trial because of its tangential relationship to the State's case and the fact that the jury heard arguments refuting the connection between the casing and the murder of Mrs. Giles.

### 6. New Evidence of Dawan Harris' and Kellee Mitchell's Guilt

Purnell argues that the jury never heard about the suspicious nature of Dawan and Mitchell's acquisition of the .38-caliber revolver. Purnell submitted a video of Dawan Harris' interrogation by police[158] and a transcript of Cameron Johnson's interrogation by police.[159] Purnell claims that Cameron Johnson's statement that the revolver was stolen two or three weeks before the murder is new evidence that would likely change the result at trial because it contradicts Dawan Harris' statement that he did not obtain the gun until a few weeks after the murder of Mrs. Giles.

The State argues that the evidence is neither new nor would change the result at trial. The State points to the trial record which demonstrates that the jury was aware that Mitchell and Harris were once suspects and that Mitchell did not have an

---

[158] D.I. 119, Ex. 19, Videotaped Statement of Dawan Harris.
[159] D.I. 119, Ex. 20, Cameron Johnson Interview.

alibi, and that trial counsel argued that Mitchell gave his statement because he fit the description of the second assailant and was the one who actually committed the murder.

The Court finds that neither the video of Dawan Harris's interrogation nor the Cameron Johnson interrogation are new evidence. While this information may not have been focused on by Purnell's trial counsel, it is not new because it was information that was available at the time of trial. Again, Purnell offers no proof that he made diligent efforts to obtain this information and was denied.

### 7. Cumulative Effect of Evidence Does Not Create a Strong Inference of Purnell's Actual Innocence

Virtually none of the evidence that Purnell presents in the Motion qualifies as new evidence in the Rule 61 context. Additionally, the operative effect of Purnell's proffered evidence is to belatedly attempt to create reasonable doubt as to Purnell's guilt for the charges of which he was convicted. However, Purnell's trial has long since been concluded, the jury as fact-finder found that the State met its burden of proving guilt beyond a reasonable doubt, and his conviction and sentence are no longer reviewable on the grounds of reasonable doubt. The Court finds that Purnell's submission of new evidence fails to create a strong inference of his actual innocence of the acts underlying the crimes for which he was charged. Further, the Court finds no valid reason to expand the record in this case to permit an evidentiary hearing.

## III. CONCLUSION

For the foregoing reasons, Purnell's asserted claim of actual innocence does not create a strong inference that he is actually innocent in fact of the acts underlying the crimes for which he was charged. Purnell's actual innocence claim is hereby **DENIED**, and all other claims asserted in Purnell's second Motion for Postconviction Relief are **SUMMARILY DISMISSED**.

**IT IS SO ORDERED**, THIS 19TH DAY OF FEBRUARY, 2020.

_____
Sheldon K. Rennie, Judge

Original to Prothonotary

Cc:   Mark Purnell (SBI #00449155), HYRCI, Wilmington, DE
Herbert Mondros, Esq., 300 Delaware Ave, Wilmington, DE
Elizabeth MacFarlan, Esq., Chief of Appeals, DOJ, Wilmington, DE